# In the United States Court of Federal Claims

No. 23-1319C

(Filed Under Seal: December 20, 2023)

(Filed: January 8, 2024)

|  |  |
|---|---|
| **SUPERIOR WASTE MANAGEMENT LLC,** | ) ) ) |
| *Plaintiff,* | ) ) ) |
| **v.** | ) ) |
| **THE UNITED STATES,** | ) ) |
| *Defendant.* | ) ) ) |

*Douglas P. Hibshman*, Fox Rothschild LLP, Washington, D.C., for Plaintiff.  With him on the briefs were *Nicholas T. Solosky* and *Dana Molinari*.

*Patrick Angulo*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Corinne A. Niosi*, Assistant Director.

## OPINION AND ORDER*

**SOLOMSON, Judge.**

In this procurement protest case, involving a FAR part 14 sealed bid process,[1] Plaintiff, Superior Waste Management ("Superior"), challenges the decision of

---

\* On December 20, 2023, the Court issued, under seal, this opinion and order and provided the parties the opportunity to file proposed redactions by January 5, 2024.  ECF No. 21.  The parties did not file proposed redactions.  Accordingly, the Court reissues a public version of the opinion and order without redactions (but with minor, non-substantive changes to correct typographical errors).

[1] There is a difference between a bid and a proposal.  *See* FAR 2.101 ("*Offer* means a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract. Responses to invitations for bids (sealed bidding) are offers called 'bids' or 'sealed bids'; responses to requests for proposals (negotiation) are offers called 'proposals'; however, responses to requests for quotations (simplified acquisition) are 'quotations', not offers.").

Defendant, the United States, acting by and through the Department of the Army, to award a waste disposal contract to another bidder, Nisou Enterprises, Inc. ("Nisou"). Superior alleges that this procurement must be trashed and started over because the Army's contracting officer botched a required unbalanced-pricing analysis.

For the reasons explained below, the Court concludes that Superior has failed to demonstrate that the government made any prejudicial error in this procurement. The path from Superior's complaint to this Court's resolution is anything but straightforward given the complexity of the government's alleged errors and Superior's assertions that such errors are prejudicial *per se* (not to mention the possible jurisdictional implications of the prejudice issues). But with all of that considered, this Court concludes that the government is entitled to judgment on the administrative record. In the alternative, even if Superior had succeeded on the merits of its complaint, Superior is not entitled to injunctive relief.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

### A.  The Solicitation

On March 1, 2022, the Department of the Army's Mission and Installation Contracting Command – Fort Riley ("the Army") issued Invitation for Bid No. W911RX22B0003 ("the Solicitation" or "IFB"). AR 73. The Solicitation's Performance Work Statement explains that it seeks a contractor to provide "refuse and recycling services and [to] operate the construction and demolition landfill and tree and brush debris disposal area at U.S. Army Garrison Fort Riley" in Kansas. *Id.* at 136.

The Solicitation provides that the Contracting Officer ("CO") will award the contract "to the responsible bidder whose bid, conforming to the invitation, will be most advantageous to the Government, considering only price and the price-related factors included in the invitation." AR 119 ("Evaluation Factors," ¶ 1.1). Pursuant to FAR 14.408-2, the CO "shall determine that a prospective contractor is responsible [in accordance with] Subpart 9.1." *Id.* ¶ 1.2.1. To that end, the Solicitation requires bidders to provide "the relevant corporate financial information contained in Attachment 9 — Pre-Award Information of the IFB"; "[f]ailure to provide the financial information . . . shall be the basis to determine the bidder as non-responsible and eliminated from the

---

[2] This background section constitutes the Court's findings of fact drawn from the administrative record. Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), covering judgment on the administrative record, "is properly understood as intending to provide for an expedited trial on the record" and requires the Court to "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354, 1356 (Fed. Cir. 2005). Citations to the administrative record, ECF No. 9-1, are denoted as "AR" followed by the page number **bolded** in the lower right-hand corner of each page of the administrative record. Additional findings of fact are made throughout Part V.

award process." *Id.* ¶ 1.2.1.1.1.1. A prospective contractor must also have a "satisfactory performance record," and thus bidders had to complete the "Past Performance Questionnaire in Attachment 9 — Pre-Award Information" and submit it with their bid. *Id.* ¶ 1.2.1.1.3.1.

The Army initially received three bids in response to the Solicitation, including from Superior and Nisou. AR 1758. Although the Army initially identified Superior as the low bidder on April 27, 2022, the date of bid opening, the Army did not make any awards. *Id.* The CO received a fourth bid after bid opening that was considered timely pursuant to the FAR. *Id.* (citing FAR 52.215-1(c)(3)(ii)). The CO subsequently "determined that [Superior's] and Nisou's bids contained apparent clerical errors that required clarifications," and permitted both bidders to correct their bids, which they did. *Id.* Ultimately, the CO identified Nisou as the low bidder and apparent awardee on May 19, 2022, with the last-minute bid identified as second-lowest in price and Superior as the third-lowest in price. *Id.*; *see also* AR 1509.[3]

### B. Agency Protest

Superior filed an agency-level protest on May 26, 2022.[4] AR 970. In that protest, Superior alleged that: (1) Nisou's bid was unbalanced and defective; (2) Nisou was not responsible based on its lack of experience in the solid waste industry; and (3) Nisou's bid failed to comply with the Solicitation's sealed bidding process. *Id.* at 971–75. Superior claimed interested-party status as "the lowest bidder at bid opening, and . . . the lowest responsive and responsible bidder." *Id.* at 971.

Three months later, on August 23, 2022, the Army denied Superior's protest. AR 992. The Army found that Nisou's bid was balanced, that Nisou was a responsible bidder, and that Superior's remaining objection, regarding Nisou's method of bid transmission, was untimely. *Id.* at 993–94. The Army also determined that Superior was not "next in line" for the award, because the fourth bidder, CVICS, submitted the second-lowest responsive bid. *Id.* at 993. Although the Army acknowledged that Superior may not have known that CVICS was a lower bidder, "that fact still stands in the way of [Superior] being an interested party to submit a protest." *Id.* (internal quotations and citation omitted).

---

[3] The fourth bidder was a team: Cal Vet Integrated Consulting Services, Inc., and Avartara, LLC, known collectively as CVICS. *See* AR 1768. Some Army memoranda and Plaintiff's motion for judgment on the administrative record refer to CVICS as Civics. *See* AR 1485; ECF No. 10-1 at 1. CVICS is hereinafter referred to by its proper abbreviated name, and quotations that originally referred to CVICS as "Civics" have been amended without brackets or parentheticals.

[4] *But see* AR 1758 (indicating that the protest was filed on May 27, 2022).

### C.  Government Accountability Office ("GAO") Protest

The Army awarded Nisou the contract on September 1, 2022.  AR 1527.  That same day, Superior filed a bid protest at GAO.  AR 1745.  Superior asserted that: (1) Nisou's bid was unbalanced to an extent that posed an "unacceptable risk . . . of nonperformance"; (2) the government "mismanaged the procurement" by accepting CVICS' late bid and Nisou's "defective" bid; and (3) "Nisou is not responsible to perform the work based on its clear lack of experience in the solid waste industry." AR 1746.

On December 8, 2022, GAO denied Superior's protest in part and dismissed it in part.  AR 2299-2309.  First, GAO determined that the Army reasonably accepted CVICS' second-place bid.  *Id.* at 2306.  Even though CVICS' bid did not arrive at the correct office before the noon deadline on April 27, 2022, GAO found that this was the Army's fault, as it "failed to implement any sort of procedures to ensure the timely receipt of bids."  *Id.* Second, GAO found that the Army correctly determined that CVICS' bid was responsive. *Id.* at 2307–08.  Finally, GAO concluded that Superior was not an "interested party," because the Army properly accepted CVICS' second-place bid.  *Id.* at 2308–09.  Thus, GAO dismissed Superior's protest.  *Id.*

### D.  Superior's Initial Complaint and the Government's Corrective Action

On January 13, 2023, Superior filed its initial complaint against the United States in this Court.  *See Superior Waste Management LLC v. United States*, Fed. Cl. No. 23-50, ECF No. 1.  A week later, on January 20, 2023, the government notified the Court that the Army would implement corrective action.  Fed. Cl. No. 23-50, ECF No. 7.  The government explained that "[t]he Army intend[ed] to reconsider its award decision after taking corrective action in this protest by reviewing all bidders' proposals in accordance with all requirements of Section 1.3.1.3.2 of the Invitation For Bids" and that this "corrective action would include redoing the source selection decision making process, including, but not limited to, having a price analysis team redo the price analysis to comply fully with the provision identified above, and addressing any responsibility and responsiveness issues as required by the Invitation For Bids."  *Id.* at 1.

As a result, on January 27, 2023, Superior moved to voluntarily dismiss its complaint without prejudice.  No. 23-50, ECF No. 8.  The Court granted Superior's motion that same day via Minute Order.

On July 28, 2023, the Army notified Superior that the Army had completed its corrective action, resulting in Nisou's winning the contract once again.  AR 2365.

### E.  Superior's Claims in this Court

On August 15, 2023, Superior filed its second complaint in this Court regarding the procurement at issue.  ECF No. 1 ("Compl.").  Therein, Superior alleged that the Army erred by: (1) failing to reject Nisou's and CVICS' bids as unbalanced, Compl. ¶¶ 41-69 (Count I); (2) failing to reject Nisou's bid because it was not submitted properly, *id.* ¶¶ 70-73 (Count II); (3) finding that Nisou was responsible to perform the contract was arbitrary, unreasonable, and contrary to law, *id.* ¶¶ 74-79 (Count III); and (4) failing to reject CVICS' bid as late and non-responsive, *id.* ¶¶ 80-98 (Count IV).

On August 29, 2023, the government filed the administrative record.  ECF No. 9-1 ("AR").  On September 20, 2023, Superior filed its combined motion for judgment on the administrative record ("MJAR")[5] and to supplement the administrative record.  ECF No. 10-1 ("Pl. MJAR"); ECF No. 10-2 ("Pl. Supp.") (containing documents Superior seeks to have added to the administrative record).  The parties completed briefing with the government's cross-MJAR and response, ECF No. 11 ("Def. MJAR"), Superior's response and reply, ECF No. 13, and the government's reply, ECF No. 14.  The Court held oral argument on November 15, 2023.  ECF No. 15 ("Tr.").

During oral argument, the Court asked the parties about alleged math errors in the Army's calculations that Superior claimed were central to Counts I-III, *see* Compl. at ¶¶ 5, 40, and whether a corrected calculation would redress Superior's grievances.  Tr. at 22:1-25:20.  In its briefs, the government conceded that Superior was right about how the Army had done the math but the government  maintained that its "different methodology" was not "erroneous"; rather, the government asserted, it was a "reasonable" way of conducting the relevant price analysis.  *See* Def. MJAR at 12.  The government later abandoned that argument, however, conceding that at least some of the math had been wrong.  Tr. at 67:4-10.  At oral argument, the government provided the Court and Superior with a demonstrative showing the corrected calculations, *id.* at 36:5-37:10, and reasserted that its prior mistakes were not prejudicial.  *Id.* at 56:4-58:8.  Following oral argument, the Court ordered the parties to confer and to file a "final, agreed-upon demonstrative exhibit, showing the corrected price analysis" that Superior maintains the Army should have calculated from the outset.  ECF No. 15.  The parties filed the demonstrative on November 20, 2023, and stipulated to the accuracy of the pertinent new calculations.  ECF No. 16 (describing some price comparisons as "corrected" and others merely "recalculated").

## II.  JURISDICTION, STANDING, AND PREJUDICE

Given the recent decision of our appellate court, the United States Court of Appeals for the Federal Circuit, in *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145 (Fed. Cir.

---

[5] *See* Rule 52. 1 of the Rules of the United States Court of Federal Claims ("RCFC").

2023) — and the centrality of the prejudice question in this case — this Court must reconcile various pronouncements from the Federal Circuit on that subject, as well as the related issues of jurisdiction and standing. *Reforce, Inc. v. United States*, 853 F.3d 1249, 1263 (Fed. Cir. 2017) ("[B]oth parties agree that [plaintiff] has satisfied its standing requirements in this case. Nevertheless, because standing is a jurisdictional prerequisite, we must independently determine whether [plaintiff] has satisfied its Article III standing requirements."); *see* RCFC 12(h)(3).

### A. First Principles

#### 1. Article III Standing vs. Subject Matter Jurisdiction – In General

More than 30 years ago, the Federal Circuit criticized the "indiscriminate use of the naked term 'jurisdiction.'" *Rhone Poulenc, Inc. v. United States*, 880 F.2d 401, 402 (Fed. Cir. 1989) ("Use of that term unmodified has frequently provided fertile ground for the growth of obfuscation."). Still today, adhering to the Federal Circuit's admonition, this Court finds it important to be precise. We thus begin with the basics.

Article III (§ 2, cl. 1) of the Constitution limits the exercise of the judicial power to "Cases" and "Controversies." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 438 (2017). "This fundamental limitation preserves the 'tripartite structure' of our Federal Government, prevents the Federal Judiciary from 'intrud[ing] upon the powers given to the other branches,' and 'confines the federal courts to a properly judicial role.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337–338 (2016)); *see Salazar v. Buono*, 559 U.S. 700, 734 (2010) (Scalia, J., concurring) ("Article III's case-or-controversy requirement is not merely a prerequisite to relief, but a restraint on judicial power."). The Supreme Court has developed "specific but overlapping doctrines rooted in the same [case-or-controversy] Article III inquiry, which must be met for a controversy to be justiciable, including standing, ripeness, and a lack of mootness." *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1336 (Fed. Cir. 2008); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("The doctrines of mootness, ripeness, and political question all originate in Article III's 'case' or 'controversy' language, no less than standing does.").

Although Article III's requirements are jurisdictional in a broad sense, they are more accurately characterized as prerequisites to subject matter jurisdiction. *See, e.g.*, *Gardner v. Mutz*, 962 F.3d 1329, 1337 (11th Cir. 2020) (discussing "Article III's jurisdictional prerequisites"); *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016) "([S]tanding is a prerequisite to a federal court's subject matter jurisdiction[.]"); *JW by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1264 (11th Cir. 2018) ("Article III standing is a prerequisite to a federal court's exercise of subject-matter jurisdiction."); *Rivera v. Internal Revenue Serv.*, 708 F. App'x 508, 513 (10th Cir. 2017) ("Under Article III of the Constitution, standing is a prerequisite to subject matter jurisdiction that we must address, *sua sponte* if necessary, when the record reveals a

colorable standing issue."); *California Valley Miwok Tribe v. Salazar*, 281 F.R.D. 43, 46 (D.D.C. 2012) ("[A] party's Article III standing is a prerequisite to subject matter jurisdiction."); *Zanotti v. Invention Submission Corp.*, 2020 WL 2857304, at *10 (S.D.N.Y. June 2, 2020) (concluding that "Article III standing is a necessary, non-waiveable prerequisite to subject matter jurisdiction" such that "[i]n the absence of standing, it is irrelevant that the Court generally has federal question jurisdiction over [various statutory] claims").

The Federal Circuit has recognized this fundamental distinction between Article III prerequisites and other jurisdictional considerations: "*Assuming the presence of a constitutionally required case or controversy*, federal court jurisdiction comes in many shapes and sizes; hence understanding frequently requires an adjectival modifier. There are significant distinctions, for example, between subject matter jurisdiction, in personam jurisdiction, in rem jurisdiction, geographic jurisdiction, diversity jurisdiction, and pendent jurisdiction." *Rhone Poulenc*, 880 F.2d at 402 (emphasis added).

"To establish a case or controversy, a party invoking federal jurisdiction must meet the 'irreducible constitutional minimum of standing.'" *Allgenesis Biotherapeutics Inc. v. Cloudbreak Therapeutics*, LLC, 85 F.4th 1377, 1380 (Fed. Cir. 2023) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, (1992)). In general, the Article III standing inquiry asks whether the plaintiff has "demonstrate[d] a concrete and particularized injury caused by the defendant[.]" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 141 S. Ct. at 2203 (citing *Lujan*, 504 U.S. at 560-61).[6]  In contrast to other Article III standing requirements, "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).[7]  To establish injury in fact, a plaintiff must show that it suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "'actual or imminent, not conjectural or hypothetical.'" *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). Standing is evaluated not only at the inception of litigation, but throughout the entire dispute. *Uzuegbunam v. Preczewski*, 592

---

[6] *See also BASF Corp. v. Ingevity S.C., LLC*, -- F.App'x --, 2023 WL 4115908, at *3 (Fed. Cir. June 22, 2023) ("To establish Article III standing, [a plaintiff] must show:  (1) it 'suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" (quoting *Spokeo*, 578 U.S. at 338, as revised (May 24, 2016))).

[7] "It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997), *quoted in Spokeo*, 578 U.S. at 339.

U.S. 279, 141 S.Ct. 792, 796 (2021) ("At all stages of litigation, a plaintiff must maintain a personal interest in the dispute.").

In contrast to standing, subject matter jurisdiction "refers to the class of cases that the court is authorized to hear." *Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1052 (Fed. Cir. 2012) (citing *Rhone Poulenc*, 880 F.2d at 402–03)); *see also Palmer v. United States*, 38 Fed. Cl. 316, 320 (1997) ("Subject matter jurisdiction relates to the area of substantive law that Congress has empowered the court to adjudicate."), *aff'd*, 168 F.3d 1310 (Fed. Cir. 1999); *CYR Const. Co. v. United States*, 27 Fed. Cl. 153, 161 (1992) ("Subject matter jurisdiction relates to the court's general powers to adjudicate in specific areas of substantive law."). Supreme Court decisions support this formulation. *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("Subject matter jurisdiction defines the court's authority to hear a given type of case[.]" (quoting *United States v. Morton*, 467 U.S. 822, 828 (1984)); *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 316 (2006) ("Subject-matter jurisdiction . . . concerns a court's competence to adjudicate a particular category of cases[.]"); *Henderson v. United States*, 517 U.S. 654, 671 & n.19 (1996) (explaining that the "court's jurisdiction to adjudicate a controversy of a particular kind" is known as "subject-matter jurisdiction").

A complaint "raises a question within the court's subject matter jurisdiction as long as the asserted basis of jurisdiction is not pretextual, i.e., as long as the jurisdictional ground asserted in the complaint," *Lewis v. United States*, 70 F.3d 597, 603 (Fed. Cir. 1995), does not "appear[] to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous," *Bell v. Hood*, 327 U.S. 678, 682–83 (1946); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

Because the concepts of standing and subject matter jurisdiction share some characteristics, and one is considered a prerequisite to the other, they are often at risk of conflation. But as courts across the nation have recognized, parties and courts should not "conflate[] separate and distinct concepts: standing and subject matter jurisdiction." *Wendland v. Gutierrez*, 580 F. Supp. 2d 151, 153 n.2 (D.D.C. 2008) (rejecting argument that "the court has subject matter jurisdiction because [plaintiff] satisfies the requirements for standing"); *see also Nat'l Health Plan Corp. v. Teamsters Loc. 469*, 585 F. App'x 832, 834 n.2 (3d Cir. 2014) ("The question of whether the district court had subject-matter jurisdiction is, however, distinct from the question of whether [a plaintiff] ha[s] 'standing to invoke the authority of a federal court.'" (quoting *DaimlerChrysler,* 547 U.S. at 342)).

Reasserting the difference between the two is therefore an important task of courts seeking to ameliorate the confusion. The United States Court of Appeals for the Second Circuit succinctly explained the distinction as follows:

> [S]tanding and *subject matter* jurisdiction are separate questions. While standing, which is an issue of justiciability,

8

addresses the question whether a federal court may grant relief to a party in the *plaintiff's* position, subject matter jurisdiction addresses the question whether a federal court may grant relief to *any* plaintiff given the claim asserted. Thus, although both subject matter jurisdiction and standing (as well as other questions of justiciability) act to limit the power of federal courts to entertain claims, that is, act to limit the courts' "jurisdiction" in the broadest sense of the term, the two must be treated distinctly.

*Rent Stabilization Ass'n of City of New York v. Dinkins*, 5 F.3d 591, 594 n.2 (2d Cir. 1993) (internal citations omitted) (citing *Baker v. Carr,* 369 U.S. 186, 198–208 (1962), and *Flast v. Cohen,* 392 U.S. 83, 98–99  (1968)); *see also Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1299 n.11 (Fed. Cir. 2022) (characterizing standing as a "distinct issue" from subject matter jurisdiction); *Impress Co'mc'ns v. Unumprovident Corp.*, 335 F. Supp. 2d 1053, 1057 (C.D. Cal. 2003) ("While the issue of standing is distinct from that of subject matter jurisdiction, standing also poses a critical jurisdictional limitation.").

In sum, "Article III standing is the only kind of standing required before a federal district court can exercise subject matter jurisdiction." *Abraugh v. Altimus*, 26 F.4th 298, 303 (5th Cir. 2022); *cf. All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 89 n.6 (2d Cir. 2006) ("Although lack of Article III standing and subject matter jurisdiction are distinct concepts, Article III standing remains, as we have noted, a limitation on the authority of a federal court to exercise jurisdiction." (citations omitted)).  In any event, "[t]he party invoking federal jurisdiction bears the burden of establishing standing." *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002)).

For our purposes, in discussing 28 U.S.C. § 1491(b), perhaps the most critical "distinction is [the one] required between the question of whether a court has subject matter jurisdiction as defined by Congress and the question of whether a plaintiff has failed to state a claim or lacks standing to invoke that jurisdiction." *Rhone Poulenc*, 880 F.2d at 402.  This is the fundamental distinction between a court's competence to hear a particular type of case and a specific plaintiff's ability to bring it.

## 2.  Statutory Standing

As early as 1985, the Supreme Court implicitly distinguished between Article III standing considerations and so-called statutory standing, recognizing that the latter could be decided *before* the former.  *Fed. Election Comm'n v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 489–90 (1985) ("In view of our conclusion that the Democrats lack standing under the statute, there is no need to reach the Art. III issue decided by the District Court."); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) (concluding that

"statutory standing . . . may properly be treated before Article III standing" (citing *Steel Co.*, 523 U.S. at 92)).

Justice Scalia, concurring in *Holmes v. Securities Investor Protection Corp.*, may well have been the first justice to attempt to define the concept of statutory standing: "whether the so-called nexus (mandatory legalese for 'connection') between the harm of which this plaintiff complains and the defendant's so-called predicate acts is of the sort that will support an action under [the statute at issue]." 503 U.S. 258, 286–87 (1992) (applying this principle to a civil Racketeer Influenced and Corrupt Organizations Act case).

The Supreme Court itself, however, did not adopt or otherwise expressly define the concept of statutory standing in those early cases, but *did* note continuing confusion, explaining that "use [of] the terms 'cause of action' and 'standing'" requires "precision" because "the distinct concepts can be difficult to keep separate." *Bond v. United States*, 564 U.S. 211, 218 (2011) ("If, for instance, the person alleging injury is remote from the zone of interests a statute protects, whether there is a legal injury at all and whether the particular litigant is one who may assert it can involve similar inquiries."). In *Bond*, the Supreme Court cited *Steel Co.* for the proposition that statutory standing and the existence of a cause of action are "closely connected" and "sometimes identical" questions. *Id.* (quoting 523 U.S. 83, 96–97 & n. 2).

In *Lexmark International, Inc. v. Static Control Components, Inc.*, Justice Scalia had the opportunity to more fully explicate the Supreme Court's view of statutory standing, this time in a unanimous decision. 572 U.S. 118 (2014). The case involved "the appropriate analytical framework for determining a party's standing to maintain an action for false advertising under the Lanham Act," 15 U.S.C. § 1125(a). 572 U.S. at 125. The parties briefed the issue "as one of 'prudential standing'" but the Court found "that label misleading," and so began "by clarifying the nature of the question at issue[.]" *Id.* Although the Supreme Court acknowledged that it previously had employed the term "prudential standing" to describe non-Article III standing considerations, Justice Scalia in *Lexmark* clarified that the Court had intended only "to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 127.

Thus, in *Lexmark*, the Supreme Court explained that "the question [that] case presents is whether [plaintiff] Static Control falls within the class of plaintiffs whom Congress has authorized to sue under [the Lanham Act]" or, put differently, "we ask whether Static Control has a cause of action under the statute." 572 U.S. at 128. And that question, in turn, "requires us to determine the meaning of the congressionally enacted provision creating a cause of action." *Id.* This inquiry, explained Justice Scalia on behalf of the Court, is what "[w]e have on occasion referred to . . . as 'statutory standing' and treated it as effectively jurisdictional." *Lexmark*, 572 U.S. at 128 n.4 (citing *Steel Co.*, 523 U.S. 83, 97 & n.2). The Supreme Court preferred "[t]hat label [as] an improvement over

the language of 'prudential standing'"[8] because "it correctly places the focus on the statute." *Id.* The problem, however, is that "statutory standing" is also "misleading" because "the absence of a valid (as opposed to arguable) cause of action does *not* implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case." *Id.* (emphasis added) (quoting *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 642–643 (2002)).

Accordingly, although *Lexmark* did not expressly disturb earlier decisions holding that a court may resolve statutory standing issues prior to deciding any Article III questions, *Lexmark* teaches that statutory standing generally is *not* jurisdictional.

### 3. Tucker Act Subject Matter Jurisdiction

The Court of Federal Claims "lacks the general federal question jurisdiction of the district courts." *Crocker v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1997); *see* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). While "the Court of Federal Claims, like all federal courts, is a court of limited jurisdiction[,] [i]ts jurisdiction is generally defined by the Tucker Act," 28 U.S.C. § 1491. *Bibbs v. United States*, 230 F.3d 1378 (Fed. Cir. 2000); *see also RadioShack Corp. v. United States*, 566 F.3d 1358, 1360 (Fed. Cir. 2009) (noting that, generally, "the jurisdiction of the Court of Federal Claims is defined by the Tucker Act, which gives the court authority to render judgment on certain monetary claims against the United States"). The Federal Circuit has recognized that "the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests" pursuant 28 U.S.C. § 1491(b). *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380 (Fed. Cir. 2012); *see also ECC Int'l Constructors, LLC v. Sec'y of Army*, 79 F.4th 1364, 1378 n.12 (Fed. Cir. 2023) (recognizing that "28 U.S.C. § 1491(b)(1) waives the government's sovereign immunity for bid protests").

In Tucker Act cases of either the monetary claim, 28 U.S.C. § 1491(a), or bid protest variety, *id.* § 1491(b), the statute's wording has made parsing jurisdictional matters from merits questions difficult. In *Fisher v. United States*, for example, the Federal Circuit lamented that "[i]n Tucker Act jurisprudence [the] neat division between [subject matter] jurisdiction and merits has not proved to be so neat." *Fisher v. United States*, 402 F.3d 1167, 1171 (Fed. Cir. 2005). In such cases, "involving suits against the United States for money damages, the question of the court's jurisdictional grant blends with the merits of the claim. This mixture has been a source of confusion for litigants and a struggle for the courts." *Id.* More than six years after *Fisher*, the Federal Circuit noted the problem's

---

[8] The Supreme Court jettisoned the notion of limiting a plaintiff from proceeding due to concerns of prudence: "Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created merely because 'prudence' dictates." 572 U.S. at 128 (internal citation omitted).

persistence: "Courts frequently confuse or conflate the distinction between subject matter jurisdiction and the essential elements of a claim for relief." *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011).[9]

In *Engage Learning,* the Federal Circuit concluded that, for a contract claim, subject matter "jurisdiction under [28 U.S.C. § 1491(a)] requires no more than a non-frivolous *allegation* of a contract with the government." 660 F.3d at 1353 (citing *Lewis v. United States*, 70 F.3d 597, 602, 604 (Fed. Cir. 1995), and *Gould, Inc. v. United States*, 67 F.3d 925, 929–30 (Fed. Cir. 1995)). For a money-mandating claim, "all that is required is a determination that the claim is founded upon a money-mandating source [of law] and the plaintiff has made a nonfrivolous allegation that it is within the class of plaintiffs entitled to recover under the money-mandating source." *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008).[10]

As previously noted, this Court also has subject matter jurisdiction to decide bid-protest-type actions pursuant to 28 U.S.C. § 1491(b).[11]   Such bid protest jurisdiction

---

[9] This Court previously described the problem in § 1491(a) as follows:

> The question of when a claim should be dismissed for lack of jurisdiction pursuant to RCFC 12(b)(1) — as opposed to for failure to state a claim pursuant to RCFC 12(b)(6) — has engendered no small amount of confusion within this Circuit and among litigants. The Tucker Act's language itself may be to blame. In a single sentence, the Tucker Act appears to link inextricably the jurisdictional and merits inquiries by vesting this Court with "***jurisdiction*** to render judgment upon" particular "***claim[s]*** against the United States." 28 U.S.C. § 1491(a)(1) (emphasis added).

*Perry v. United States*, 149 Fed. Cl. 1, 10 (2020) (footnote omitted), *aff'd*, No. 2020-2084, 2021 WL 2935075 (Fed. Cir. July 13, 2021).

[10] In *Jan's Helicopter*, the Federal Circuit explained that the jurisdictional pleading requirement "is satisfied when a plaintiff makes 'a non-frivolous assertion that [plaintiffs] are entitled to relief under the statute.'" 525 F.3d at 1307 n.8 (citing *Brodowy v. United States*, 482 F.3d 1370, 1375 (Fed. Cir. 2007)); *see Brodowy*, 482 F.3d at 1375 ("Where plaintiffs have invoked a money-mandating statute and have made a non-frivolous assertion that they are entitled to relief under the statute, we have held that the Court of Federal Claims has subject-matter jurisdiction over the case."); *Moden v. United States*, 404 F.3d 1335, 1341–42 (Fed. Cir. 2005) ("[W]e have [subject matter] jurisdiction to address the merits of this case, as did the Court of Federal Claims, because the [plaintiffs'] claim is neither frivolous nor so insubstantial, implausible, foreclosed by prior decisions, or otherwise completely devoid of merit as not to involve a federal controversy."). For Contract Disputes Act ("CDA") complexities, see *ECC Int'l Constructors,* 79 F.4th at 1368 (addressing "whether the FAR requirement to state a sum certain in bringing a claim under the CDA, 41 U.S.C. §§ 7101–7109, is indeed jurisdictional").

[11] *See Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 559 & n.18 (2021) (explaining that "Section 1491(b) actions are typically referred to as 'bid protests'"). While the Federal Circuit recently wrote that "federal district courts have jurisdiction to review bid protests under the [APA]," *SEKRI, Inc. v. United States*, 34 F.4th 1063, 1071 n.7 (Fed. Cir. 2022), such jurisdiction has been

"covers a broad range of potential disputes arising during the course of the procurement process." *Sys. Application & Techs.*, 691 F.3d at 1380.  Indeed, the Federal Circuit has held that the Tucker Act, "[o]n its face, . . . grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement." *Id.* at 1380-81 (finding jurisdiction where the plaintiff's "complaint specifically challenged the Army's announced decision to amend or revise the solicitation — an unambiguous objection 'to a solicitation' covered by the Tucker Act").  For the latter type of protest, for example — involving an alleged "statutory or regulation violation" — "[a]ny 'nonfrivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement is sufficient to establish [subject matter] jurisdiction.'" *LAX Elecs., Inc. v. United States*, 835 F. App'x 553, 557 (Fed. Cir. 2020) (quoting *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345 n.1. (Fed. Cir. 2008)).

Accordingly, for subject matter jurisdiction, this Court asks only whether a plaintiff's complaint contains non-conclusory *factual* allegations supporting a Tucker Act claim.  Standing — including bid protest standing, in particular — is more complicated.

### 4.  Bid Protest Standing

The United States Court of Federal Claims, "though an Article I court, applies the same standing requirements enforced by other federal courts created under Article III." *Starr Int'l Co., Inc. v. United States*, 856 F.3d 953, 964 (Fed. Cir. 2017) (quoting *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003)) (internal quotation marks omitted). Indeed, the Federal Circuit has expressly applied Article III justiciability requirements to Tucker Act claims against the United States.  *Glass v. United States*, 258 F.3d 1349, 1355 (Fed. Cir. 2001).  That makes a great deal of sense as the Court of Federal Claims is empowered to enter final judgments on any "claim, suit, or demand against the United States arising out of the matters involved in the *case or controversy*."  28 U.S.C. § 2519 (emphasis added).  That statute clearly tracks the Article III "case-or-controversy requirement," *Lujan*, 504 U.S. at 560, and thus imports its minimum standards.  There are yet additional reasons for applying Article III requirements in this Court.  *See Emerald Int'l Corp. v. United States*, 54 Fed. Cl. 674, 677 n.5 (2002).[12]

---

sunset by statute (at least those actions filed by an "interested party"), *see Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("The jurisdiction of the district courts subsequently terminated on January 1, 2001, pursuant to a sunset provision in the [Administrative Dispute Resolution Act ("ADRA")]." (citing Pub.L. No. 104–320, § 12(d), 110 Stat. at 3876)).

[12] In *Emerald Int'l Corp.*, Judge Allegra explained why "a constitutional doctrine ingrained in Article III of the Constitution would be applied to an Article I court":

Standing in bid protest cases, in particular, has historically been complicated by statutory language. While "[t]raditional standing analysis invokes the 'case or controversy' requirement of Article III of the Constitution[,] . . . standing in bid protests is framed by 28 U.S.C. § 1491(b)(1), which requires that bid protests be brought by 'interested parties.'" *Sys. Application & Techs.*, 691 F.3d at 1382 (internal citation omitted). In that regard, the Tucker Act, by its plain terms, thus provides this Court with "***jurisdiction***" to decide "an action," filed "by an *interested party* objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [2] to a proposed award or [3] the award of a contract or [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (emphasis added). In other words, the plain language of "the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870[,] . . . defines not only this Court's jurisdiction over *what* actions may be brought against the government, but also *who* has standing to pursue them." *Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 559 (2021).[13]

The "interested party" requirement in these cases "imposes more stringent standing requirements than Article III." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).[14] In a post-award protest action such as this one, the Federal Circuit has defined an "interested party" as "[1] an actual or prospective bidder or offeror [2] whose direct economic interest would be affected by the award of the contract or by

_____

First, the Supreme Court has indicated that Article I courts, like their Article III counterparts, exercise the judicial power of the United States. *See, e.g., Freytag v. Commissioner*, 501 U.S. 868, 889, 111 S. Ct. 2631, 115 L.Ed.2d 764 (1991). Second, the statute empowering this court to enter final judgments specifically refers to "case or controversy," 28 U.S.C. § 2519, thereby appearing to invoke the Article III requirements. Finally, Congress has specified that judgments of this court are reviewable by the Court of Appeals for the Federal Circuit and, ultimately, the Supreme Court, both Article III tribunals that would be unable to perform such review absent a justiciable case or controversy.

54 Fed. Cl. at 677 n.5 (internal citations omitted).

[13] In contrast, 28 U.S.C. § 1491(a) does not by its terms limit the class of proper plaintiffs. Rather, it provides only that this Court shall "shall have jurisdiction to render judgment upon *any claim*" specified in that part of the Tucker Act. 28 U.S.C. § 1491(a)(1) (emphasis added).

[14] In limiting standing to interested parties, "Congress did not use the broad language" of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting APA, 5 U.S.C. § 702). The Federal Circuit was "not convinced that Congress, when using the term 'interested party' to define those who can bring suit under § 1491(b)(1), intended to confer standing on anyone who might have standing under the APA." *Id.; see also Aero Spray*, 156 Fed. Cl. at 556-71 (discussing standing and prejudice principles under APA and 28 U.S.C. § 1491(b)).

failure to award the contract." *Am. Fed'n of Gov't Emps.*, 258 F.3d at 1302 (adopting the definition of "interested party" from 31 U.S.C. § 3551(2), governing GAO protests). This conception of "interested party" contains a built-in prejudice element. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits."); *see also Electra-Med Corp. v. United States*, 140 Fed. Cl. 94, 102 (2018) ("The interested party requirement incorporates into our jurisdictional grant the need for the protestor to have a real stake in the outcome of the procurement."), *aff'd and remanded*, 791 F. App'x 179 (Fed. Cir. 2019); A. O'Sullivan, et al., *Government Contract Bid Protests: A Practical & Procedural Guide* § 4:18 (Aug. 2023 update) ("The concept of 'interested party' is closely linked to that of 'prejudice[.]'").

Until earlier this year, as discussed below, the Federal Circuit read 28 U.S.C. § 1491(b)(1) as delineating "three related requirements that are pertinent to the ***jurisdictional*** inquiry. . ., with the first addressing [this Court's] subject matter jurisdiction and the second and third addressing standing." *Diaz v. United States*, 853 F.3d 1355, 1357 (Fed. Cir. 2017) (emphasis added). The Federal Circuit explained the connection between "interested party" standing and prejudicial agency error as follows:

> The [plaintiff] first must show that it is an "interested party." *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012). To satisfy the interested party requirement, "a party must show that it [(1)] is . . . an actual or prospective bidder and [(2)] . . . has a direct economic interest" in the procurement or proposed procurement. *Id.* "To prove a direct economic interest, a party must show that it had a substantial chance of winning the contract." *Id.* (internal quotation marks and citation omitted). The second standing requirement requires a party "show that it was prejudiced by a significant error in the procurement process." *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) (citation omitted); *see id.* at 1380 (explaining that courts should not "conflat[e] the standing requirements of prejudicial error and [direct] economic interest," such that "there would be no such thing as an error non-prejudicial to an economically interested offeror," and "reiterat[ing] the established law . . . that non-prejudicial errors in a bid process do not automatically invalidate a procurement" (citations omitted)). To satisfy the prejudice requirement, the party must show that "but for the [Government's] error," the party "would have had a substantial chance of securing the contract." *Id.* at 1378 (emphasis added) (citations omitted).

*Diaz*, 853 F.3d at 1358–59; *see also CliniComp Int'l, Inc. v. United States,* 904 F.3d 1353, 1358 (Fed. Cir. 2018) ("Although the inquiries may be similar, prejudice must be shown either as part of, or in addition to, showing a direct economic interest.").

Because at least Article III standing is treated as a jurisdictional issue, its factual predicates not only must be properly alleged in a complaint, but also are susceptible to challenge via a Rule 12(b)(1) motion to dismiss at any point in the life of the case. This is true of Tucker Act cases, as well, and such arguments are a routine feature of bid protest litigation, with many lurking complications.

### 5. Challenging Jurisdictional Facts

Courts, including the Federal Circuit, uniformly "recognize two categories of jurisdictional attacks that a defendant in any court may assert: facial and factual." *Perry v. United States*, 149 Fed. Cl. at 11, *aff'd*, 2021 WL 2935075 (Fed. Cir. July 13, 2021); *see also Panavise Prod., Inc., v. Nat'l Prod., Inc.*, 306 F. App'x 570, 572 (Fed. Cir. 2009) (explaining that where a defendant "mounted a factual attack of the asserted basis of subject matter jurisdiction," the complaint allegations are not controlling and the burden shifts to the plaintiff "to demonstrate facts sufficient to support its contention regarding the court's jurisdiction"). Because Article III standing is jurisdictional, a defendant may mount a facial or factual attack on a plaintiff's standing. *Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 885 (3d Cir. 2020) ("Constitutional standing, which is properly tested under Rule 12(b)(1), may be challenged facially or factually.").

"A facial jurisdictional attack challenges whether . . . jurisdiction was properly pleaded." *Perry*, 149 Fed. Cl. at 11 (internal quotations omitted). Such an attack can take two forms. A defendant can either "assert that the plaintiff has failed to plead jurisdiction as required by Rule 8(a)(1)" or "assert that, while properly pleaded per Rule 8(a)(1), the allegations — even when assumed to be true — fail to establish jurisdiction under the relevant statute or constitutional provision." Steven S. Gensler & Lumen N. Mulligan, 1 *Federal Rules of Civil Procedure, Rules and Commentary, Rule 12* (Feb. 2020 Update); *see also Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1354-55 (Fed. Cir. 2018) ("[W]e join the majority of our sister circuits in holding that the Supreme Court's 'plausibility' requirement for facial challenges to claims under Rule 12(b)(6), as set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009), also applies to facial challenges to subject-matter jurisdiction under Rule 12(b)(1).").

A factual attack, on the other hand, "challenges the truth of the jurisdictional facts alleged in the complaint." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). Once the government lodges a factual attack against a complaint that purports to invoke the Court's subject-matter jurisdiction, the burden shifts to the plaintiff to "establish[ ] subject-matter jurisdiction by a preponderance of the evidence." *Id.* at 748.

Indeed, just this week, the Federal Circuit reaffirmed that a plaintiff has the "burden to show, by a preponderance of the evidence, that the Court of Federal Claims had jurisdiction." *Allen v. United States*, -- F.4th --, 2023 WL 8704789, at *2 (Fed. Cir. Dec. 18, 2023). Accordingly, while the trial court "may consider relevant evidence in order to resolve the factual dispute[,]" it must afford the plaintiff an "opportunity to be heard before dismissal is ordered[.]" *Id.* at 747-48. The Federal Circuit also has recently reaffirmed "the generally recognized facial/factual distinction in the treatment of jurisdictional challenges." *Mitek Sys., Inc. v. United Servs. Auto. Ass'n*, 34 F.4th 1334, 1341 n.2 (Fed. Cir. 2022) (citing 5B C. Wright, A. Miller & M. Kane, Federal Practice & Procedure Civil §§ 1350, 1363 (3d ed. Apr. 2022 Update)); *see also Pieczenik v. United States*, 2023 WL 5031507, at *2 n.2 (Fed. Cir. Aug. 8, 2023) ("Here, the government did not raise any factual disputes about the complaint's allegations in its 12(b)(1) motion to dismiss." (citing *Reynolds*, 846 F.2d at 747)).[15]

The concept of a factual attack on jurisdiction is hardly a new one in our circuit. In *Bush v. United States*, the Federal Circuit expressly agreed with Judge Firestone of this Court that even "in considering a motion to dismiss for lack of subject matter jurisdiction, a court may look beyond the pleadings and 'inquire into jurisdictional facts' to determine whether jurisdiction exists." *Bush v. United States*, 717 F.3d 920, 928 (Fed. Cir. 2013) (quoting *Bush v. United States*, 101 Fed. Cl. 791, 796 (2011) (citing *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991))); *Showalter v. Dep't of Army*, 2002 WL 77232, at *1 (Fed. Cir. Jan. 18, 2002) ("Fact-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint are challenged."); *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999) ("Fact-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged. Factual findings made by the Court of Federal Claims are reviewed by us for clear error." (internal citations omitted)); *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993) ("The government's factual challenge to the court's jurisdiction placed the burden on [the plaintiff] to demonstrate facts sufficient to support its contention regarding the court's jurisdiction. Once challenged, allegations alone are insufficient to meet the complainant's burden.").

The distinction between facial and factual jurisdictional challenges — particularly with respect to Article III standing — is firmly anchored in Supreme Court jurisprudence. While courts assume nonconclusory factual allegations are true for the purposes of resolving a facial attack at "the pleading stage" pursuant to Rule 12(b)(1), *Spokeo*, 578 U.S. at 338, the factual underpinnings for standing (or other justiciability requirements) may

---

[15] *See also Eddings v. City of Hot Springs, Ark.*, 323 F.3d 596, 602 (8th Cir. 2003) ("As the non-moving party facing a summary judgment motion, it was [the plaintiff's] burden to present some evidence to establish a genuine question of fact on the standing issues of injury and causation."); *Bischoff v. Osceola Cnty.*, Fla., 222 F.3d 874, 880 (11th Cir. 2000) ("[A] district court must resolve disputed questions of fact relevant to standing either at trial or through a pretrial evidentiary hearing[.]").

be challenged later.  Indeed, "the proof required to establish standing increases as the suit proceeds."  *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citing *Lujan*, 504 U.S. at 561).  The Federal Circuit has applied Supreme Court standing decisions similarly to other circuits.  *See Reoforce*, 853 F.3d at 1263.  In *Reoforce,* the Federal Circuit explained: "For a plaintiff to have standing under Article III of the Constitution, it must 'allege[ ] (*and ultimately prove* [ ]) an injury in fact — a harm . . . that is concrete and actual or imminent, not conjectural or hypothetical.'"  853 F.3d at 1263 (emphasis added) (cleaned up) (quoting *Steel Co.*, 523 U.S. at 103, and citing *Lujan*, 504 U.S. at 560–61); *see also Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003) ("To establish Article III standing, a plaintiff must therefore allege, *and ultimately prove*, that he has suffered an injury-in-fact that is fairly traceable to the challenged action of the defendant, and which is likely to be redressed by the requested relief." (emphasis added) (citing *Bennett v. Spear,* 520 U.S. 154, 162 (1997)).[16]

In other words, the factual predicates for jurisdiction —whether for Article III standing or other jurisdictional considerations— are nothing more than "jurisdictional facts" that are subject to challenge.  Again, there is no shortage of Federal Circuit cases supporting that contention.  *See, e.g.*, *Cedars-Sinai*, 11 F.3d at 1584-85 (explaining that "[i]n establishing the predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony" and affirming "the district court's dismissal of the action as unripe"); *Byers v. United States*, 4 F. App'x 763, 765 (Fed. Cir. 2001) ("Questions of jurisdiction, including standing, are a matter of law and are reviewed without deference by this court.  To the extent jurisdictional facts are in dispute, however, the trial court's findings of fact are reviewed by this court for clear error." (internal citations omitted)); *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1363 (Fed. Cir. 2010) (discussing standing and noting that "[t]o the extent [any] jurisdictional facts are in dispute, however, the findings of fact are reviewed for clear error" (quoting *Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1330–31 (Fed. Cir. 2008))); *Shoshone Indian Tribe of Wind River Rsrv., Wyo. V. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012) (addressing "disputed predicate jurisdictional facts" for statute of limitations purposes); *Gen. Mills, Inc. v. United States*, 957 F.3d 1275, 1284 (Fed. Cir. 2020) (quoting *Rocovich*, 933 F.2d at 993, for the proposition that "[i]n determining whether a motion to dismiss should be granted, the Claims Court may find it necessary to inquire into jurisdictional facts that are disputed," and noting that the "[trial] court's findings of fact are reviewed for clear error"); *Frazer/Exton Dev., L.P. v. United States*, 809 F. App'x 866, 869 (Fed. Cir. 2020) ("We review the Claims Court's determinations of jurisdictional facts for clear error."); *Jackson-Greenly Farm, Inc. v. United States*, 857 F. App'x 1021, 1025–26 (Fed. Cir. 2021) ("To the

---

[16] The United States Court of Appeals for the Seventh Circuit also has recognized that "[h]olding that the denial of a facial challenge to standing precludes a later factual challenge to standing would contradict the Supreme Court's instruction that 'the proof required to establish standing increases as the suit proceeds.'"  *Flynn v. FCA US LLC*, 39 F.4th 946, 954 (7th Cir. 2022) (quoting *Davis*, 554 U.S. at 734).

extent jurisdictional facts are in dispute, however, the findings of fact are reviewed for clear error." (quoting *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989)); *Hawkins v. United States*, 2022 WL 3584676, at *1 (Fed. Cir. Aug. 22, 2022) ("The court may consider extrinsic evidence when determining disputed jurisdictional facts.").

Moreover, the Federal Circuit has found a lack of standing based on a failure to prove jurisdictional facts in 28 U.S.C. § 1491(a) cases and § 1491(b) cases alike. For example, in *Flexfab, LLC v. United States*, the trial Court rejected Flexfab's "third-party beneficiary [contract] claim . . . because Flexfab has failed to present any evidence that a government employee with actual authority intended to benefit Flexfab through the . . . contract." 62 Fed. Cl. 139, 150 (2004) (granting summary judgment on a § 1491(a) claim). On appeal, the Federal Circuit viewed the trial court's ruling that "Flexfab was not an intended third-party beneficiary" as "rais[ing] a serious issue of *standing* on which the court properly focused prior to and independent of the particular merits of the case." *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005) (emphasis added) (citing *Steel Co.*, 523 U.S. at 102 (referring to the issue of standing as a "threshold jurisdictional question")). Our appellate court explained that because Flexfab was not in privity of contract with the government, "it has standing to enforce the contract only if it was an intended third-party beneficiary." *Id.* Ultimately, the Federal Circuit affirmed the trial court's holding that "[b]ecause Flexfab did not present evidence sufficient to create a question of fact that it was an intended third-party beneficiary of the contract [with the government] or that it had an implied-in-fact contract with the government, it has no standing to sue under either theory." *Id.* at 1265; *see also Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1350 (Fed. Cir. 2016) (explaining that "typically '[t]o have standing to sue the sovereign on a contract claim, a plaintiff must be in privity of contract with the United States,' and that '[s]tanding is a threshold jurisdictional issue that implicates Article III of the Constitution'" (first quoting *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003), and then quoting *S. California Fed. Sav. & Loan Ass'n. v. United States*, 422 F.3d 1319, 1328 (Fed. Cir. 2005))).[17]

---

[17] At least one Federal Circuit case, however, appears to have altogether disregarded the concept of jurisdictional facts, at least by implication. In *Columbus Reg'l Hosp. v. United States*, Judge Hertling of this Court held that a plaintiff "failed to plead 'jurisdictional facts' demonstrating the existence of a contract over which the court had Tucker Act jurisdiction." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1337 (Fed. Cir. 2021). On appeal, however, the Federal Circuit omitted any discussion of the concept of "jurisdictional facts" but instead held that "[a]s a general rule, if a plaintiff alleges breach of a contract with the government, the allegation itself confers power on the Claims Court to decide whether the claim has merit." *Id.* (citing cases). Notably, many of the cases on which the Federal Circuit relied addressed general subject matter jurisdiction, not standing. But while the Federal Circuit treated Judge Hertling's dismissal pursuant to RCFC 12(b)(1) as having improperly decided the question on "subject-matter jurisdiction" grounds, *id.*, his decision was clearly based on standing considerations: "A plaintiff must be in privity of contract with the government in order *to have standing* to sue for breach of

Returning to bid protest actions pursuant to 28 U.S.C. § 1491(b), the situation is more complex.  In A*merican Relocation Connections, L.L.C. v. United States*, the Federal Circuit explained (albeit in an unpublished decision) that "[w]hether a party has alleged an injury-in-fact (or prejudice) to establish Article III standing is distinct from whether that party can prove prejudicial error on the merits."  789 F. App'x 221, 225–26 (Fed. Cir. 2019) (citing Supreme Court decisions).  The difference between prejudice for standing and merits purposes, according to *American Relocation*, is the difference between allegations and proof:

> For standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions.  *See* [*Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)] (finding that protestor had standing "because it had greater than an insubstantial chance of securing the contract *if successful* on the merits of the bid protest" (emphasis added)).  But once we find that a party has standing, we must turn to the merits of the party's claim and determine *whether it can prove it was prejudiced based on the record evidence.  See* [*Bannum, Inc. v. United States*, 404 F.3d 1346, 1357-58 (Fed. Cir. 2005)] (finding no prejudice because "Bannum's argument rests on mere numerical possibility, not evidence").

*Am. Relocation Connections,* 789 F. App'x at 226–27 (emphasis added).

---

contract."  *Columbus Reg'l Hosp. v. United States*, 145 Fed. Cl. 217, 224 (2019) (emphasis added).  Indeed, Judge Hertling relied upon three precedential Federal Circuit cases: *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003) ("To have standing to sue the sovereign on a contract claim, a plaintiff must be in privity of contract with the United States."); *Park Properties Assocs., L.P. v. United States*, 916 F.3d 998, 1002 (Fed. Cir. 2019) ("Under the Tucker Act, the Court of Federal Claims has jurisdiction only if there is privity of contract between plaintiffs and the government."); and *Flexfab,* 424 F.3d at 1259.  The Federal Circuit mentioned none of those decisions in reviewing Judge Hertling's decision.  *Columbus Reg'l Hosp.*, 990 F.3d 1330.  *Columbus Regional* may well be an outlier given that the Federal Circuit has since invoked the very same principle as Judge Hertling did.  *See Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1296 (Fed. Cir. 2022) ("Because . . . the requisite privity of contract with the United States is absent[,] . . . [w]e, thus, affirm the Claims Court's decision to dismiss these claims on standing (privity) grounds.").  Just several days prior to its decision in *Columbus Regional*, moreover, the Federal Circuit, relying on *Flexfab*, 424 F.3d at 1263, noted that "[s]tanding to sue the United States on a contract claim is limited to those in privity of contract with the government."  *Authentic Apparel Grp., LLC v. United States*, 989 F.3d 1008, 1012 (Fed. Cir. 2021).  The appellate court in *Authentic Apparel* held that the trial court "properly dismissed [plaintiff] for lack of standing."  *Id.* at 1014.

In *American Relocation*, the plaintiff alleged that Small Business Administration ("SBA") regulations required the Customs and Border Protection agency ("CBP") to consult with the SBA during market research for a particular request for quotes ("RFQ") and that if that consultation had occurred, CBP would have likely issued the RFQ as a set-aside for small businesses. The Federal Circuit concluded that the plaintiff had standing because "[i]f [the plaintiff] were to succeed on the merits of its claim, and if CBP re-issued the . . . RFQ as a small business set-aside, [the plaintiff] would be in a better competitive position to secure the contract." *Am. Relocation Connections*, 789 F. App'x at 227–28. On the merits, however, the Federal Circuit affirmed the trial court's decision that the plaintiff did not demonstrate prejudice based on the administrative record:

> Given the administrative record, we agree with the Court of Federal Claims that [the plaintiff] cannot show that CBP might have issued the . . . RFQ as a set-aside for small businesses even if it had consulted with the SBA. We review bid protest cases according to the standards in 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4). Section 706 instructs courts that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. That rule calls on courts to apply the "same kind of 'harmless-error' rule that courts ordinarily apply in civil cases." *See Shinseki v. Sanders*, 556 U.S. 396, 406, 129 S.Ct. 1696, 173 L.Ed.2d 532 (2009) (discussing identical language in 38 U.S.C. § 7261(b)(2) and noting that "Congress intended [that statute] . . . to 'incorporate a reference' to the APA's approach"). Similarly, the federal harmless error statute instructs courts to disregard "errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111. "The correction of an error must yield a different result in order for that error to have been harmful and thus prejudice a substantial right of a party." *Munoz v. Strahm Farms, Inc.*, 69 F.3d 501, 504 (Fed. Cir. 1995). Thus, to prevail in its bid protest, [the plaintiff] must "show a significant, prejudicial error in the procurement process," meaning it must show that there is *a greater-than-insignificant chance* that CBP would have issued the . . . RFQ as a set-aside for small businesses had it not committed the alleged errors. *Alfa Laval Separation, Inc.* [*v. United States*], 175 F.3d [1365,] 1367 [(Fed. Cir. 1999)].

*Am. Relocation Connections*, 789 F. App'x at 228-29 (emphasis added) ("Given the administrative record before the agency, we find that . . . [the plaintiff] fails to show that CBP's failure . . . affected the outcome of its decision . . . . As a result, the Court of Federal Claims did not clearly err in finding that [the plaintiff] failed to establish prejudicial error, and we affirm the court's dismissal of [the plaintiff's] protest.").

The distinction drawn out in this analysis is that there is at least an arguable difference between a prejudice determination for finding standing as a threshold matter and on the ultimate merits of the claim.

On the other hand, just a few months after *American Relocation*, the Federal Circuit again concluded that a plaintiff failed to demonstrate prejudice — but this time characterized the problem, in a published decision, as a fatal *jurisdictional* defect. *See Acetris Health, LLC v. United States*, 949 F.3d 719 (Fed. Cir. 2020). In that case, Acetris filed suit in this Court challenging various regulatory interpretations from the Department of Veterans Affairs that had the effect of excluding Acetris's products from several pharmaceutical procurements. *Id.* at 725. For one such procurement, the government argued that the case was moot because, "after filing of the complaint, Acetris bid on the Entecavir solicitation" and "was not the lowest bidder." *Id.* at 726. The government thus made a classic standing argument: Acetris "could not have secured the award even if its [regulatory] interpretation[s] . . . were correct[,]" and therefore lacked standing to challenge the agency's regulatory interpretations. *Id.* at 726. Judge Sweeney denied the government's motion, "reasoning that standing was to be assessed solely on the allegations in the complaint, so later events were not properly considered in determining standing." *Id.* (discussing *Acetris Health, LLC v. United States*, 138 Fed. Cl. 579, 595-96 (2018)).

The Federal Circuit reversed, explaining that a lack of prejudice was a jurisdictional fact that vitiated standing, consistent with the Supreme Court's *Lujan* decision:

> The Supreme Court has "repeatedly held that an 'actual controversy' must exist not only 'at the time the complaint is filed,' but through 'all stages' of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91, 133 S.Ct. 721, 184 L.Ed.2d 553 (2013). Because a lack of "controversy" is a jurisdictional defect, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Claims Court should have considered the post-filing evidence. *See Int'l Elec. Tech. Corp. v. Hughes Aircraft Co.*, 476 F.3d 1329, 1330 (Fed. Cir. 2007) ("[A] court in the first instance must determine whether or not it has subject matter jurisdiction even sua sponte.").

> This evidence demonstrates that the case is moot insofar as Acetris challenges the Entecavir procurement. The VA's Entecavir solicitation explicitly stated that the lowest-price technically acceptable offer would be awarded the contract. Yet Acetris submitted the highest-price offer of the three

> offers.  Acetris therefore would not have been awarded the
> Entecavir contract even if it were correct on the merits of its
> challenge to the VA's [regulatory] interpretation[s].  *Because
> Acetris cannot show prejudice* resulting from the VA's
> purportedly flawed [regulatory] interpretation[s] . . . as
> applied to the Entecavir solicitation, *Acetris has no injury-in-
> fact* with respect to that solicitation.

*Acetris*, 949 F.3d at 726–27 (emphasis added).[18]  The Federal Circuit thus concluded that "Acetris does not now have standing to challenge the Entecavir solicitation."  *Id.* at 727.

Accordingly, following *Acetris*, the concept of "jurisdictional facts" — even as applied to standing in § 1491(b) actions — appears alive and well, even to the point of the government's ability to challenge such facts with post-complaint developments.  Indeed, *Acetris* relied upon the Supreme Court's decision in *Lujan*, which contemplates that a plaintiff may be required prove facts demonstrating standing and cannot rely merely on unsubstantiated allegations in a complaint.  *Acetris*, 949 F.3d at 726. Again, this principle is well-established in Federal Circuit jurisprudence.  *See Canadian Lumber*, 517 F.3d at 1331 ("Allegations alone may suffice to establish standing at the pleading stage, but must be supported with evidence at later stages of the litigation." (citing *Lujan*, 504 U.S. at 561)); *see also Groundbreaker Dev. Corp. v. United States*, 163 Fed. Cl. 619, 629 (2023) (holding that "this court may resolve a factual challenge to Article III standing by weighing evidence").

Whether prejudice determinations are properly viewed as involving jurisdictional facts underlying threshold standing inquiries or as a merits issue, the Federal Circuit consistently has held that "[p]rejudice is a factual question that we review for clear error." *Diaz v. United States*, 853 F.3d 1355, 1359 (Fed. Cir. 2017) (quoting *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1357–58 (Fed. Cir. 2015)); *see also Roman v.*

---

[18] Although the Federal Circuit referenced both mootness and standing as grounds for finding a lack of jurisdiction, Justice Thomas has explained the relationship between those two concepts:

> At all stages of litigation, a plaintiff must maintain a personal interest in the
> dispute.  The doctrine of standing generally assesses whether that interest exists
> at the outset, while the doctrine of mootness considers whether it exists
> throughout the proceedings.  To demonstrate standing, the plaintiff must not only
> establish an injury that is fairly traceable to the challenged conduct but must also
> seek a remedy that redresses that injury. And if in the course of litigation a court
> finds that it can no longer provide a plaintiff with any effectual relief, the case
> generally is moot.

*Uzuegbunam*, 141 S. Ct. at 796.

*United States*, 61 F.4th 1366, 1370 (Fed. Cir. 2023) ("Findings of fact relating to jurisdictional issues are reviewed for clear error.").

In sum, at least based on our circuit's historical treatment of this Court's prejudice determinations, we have been directed: (1) to assess whether a plaintiff's complaint contains sufficient factual allegations to demonstrate Article III standing; and (2) to require a plaintiff to prove jurisdictional facts when challenged post-complaint, which, in turn, may require the Court to make factual findings that go to the issue of prejudice, a necessary prerequisite for an injury-in-fact and, consequently, standing.

So far, so good.  While these concepts have always been simpler to summarize than to apply, they have at least been relatively stable for more than 20 years — that is, until the Federal Circuit's recent decision in *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145 (Fed. Cir. 2023).

### B. *CACI* Doesn't Fit

In *CACI*, the Federal Circuit reviewed a bid protest decision from Judge Somers of this Court.  In his decision, Judge Somers considered whether a plaintiff-offeror, CACI, Inc.-Federal ("CACI"), had an organizational conflict of interest ("OCI") rendering CACI ineligible for the contract award, thus precluding it from demonstrating that the government made a prejudicial error in the procurement, and, in turn, depriving CACI of standing.  *CACI, Inc.-Fed. v. United States*, 158 Fed. Cl. 1, 7 (2021).  Judge Somers framed the question as follows:

> There is no question that Plaintiff is an actual offeror.  Thus, the question of standing turns on whether Plaintiff had a direct economic interest in the award of the . . . contract.  In order to establish that it had a direct economic interest in the . . . procurement, Plaintiff must demonstrate prejudice.

*CACI*, 158 Fed. Cl. at 9.  That question normally would be resolved as an initial matter, at least, based on non-conclusory factual allegations in the plaintiff's complaint, as this Court outlined *supra*, and as Judge Somers recognized.  *Id.* at 8 (explaining that in resolving a motion to dismiss for lack of standing pursuant to RCFC 12(b)(1), "the Court must accept a plaintiff's well-pleaded factual allegations as true and draw all reasonable inferences in the light most favorable to that party").  But consistent with at least some Federal Circuit jurisprudence, Judge Somers treated the OCI issue as one involving a challenge to a jurisdictional fact — *i.e.*, prejudice and, thus, standing — particularly because the defendants moved for dismissal for lack of subject matter jurisdiction.  *Id.* ("If a challenge is raised to subject matter jurisdiction, the plaintiff has the burden of proving that the Court has jurisdiction by a preponderance of the evidence." (citing *Reynolds*, 846 F.2d at 748)).

24

Resolving the motion to dismiss, Judge Somers concluded that the plaintiff "failed . . . to carry its burden to demonstrate that it would be eligible for award [even] if the Court agreed with its arguments on the merits."  158 Fed. Cl. at 9.  He reasoned that "at the very least there is prima facie evidence [in the administrative record] that CACI's prior work . . . created a biased ground rules OCI that would disqualify CACI from being awarded a contract pursuant to the solicitation."  *Id.* at 10.

Although the government had submitted a declaration from the contracting officer to substantiate that CACI was ineligible for contract award due to an OCI, Judge Somers did not consider the *post-hoc* declaration.  158 Fed. Cl. at 10 (observing that "*[n]ormally*, the Court would need to assess how much weight, if any, to give this declaration…" (emphasis added)).  Instead, Judge Somers held that CACI simply failed to meet its burden to demonstrate prejudice — and thus standing — in the face of the government's factual attack:

> Plaintiff has completely failed to offer any evidence whatsoever that it did not have a biased ground rules OCI (much less evidence sufficient to overcome the prima facie evidence of a biased ground rules OCI that is apparent on the face of its proposal and in the sourcing of the technical requirements contained in solicitation and related documents). . . . Plaintiff's burden, however, was not to demonstrate that the government and [defendant-intervenor] had not established that an OCI exists; its burden was to prove by a preponderance of the evidence that it has standing.

*CACI*, 158 Fed. Cl. at 11 ("This is a burden Plaintiff made no attempt to meet.").

Given Judge Somers's reliance on the administrative record, perhaps the better approach in light of *American Relocation*, 789 F. App'x at 228-29, would have been to decide the prejudice question on the merits — rather than through the prism of jurisdictional facts — but the Supreme Court has endorsed the latter approach, as explained *supra*, and as Judge Somers recognized.  158 Fed. Cl. at 11 (noting that in *Lujan*, 504 U.S. at 561, the Supreme Court held that because standing is "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation").  So has the Federal Circuit. *See Phigenix, Inc. v. Immunogen, Inc.*, 845 F.3d 1168, 1172–76 (Fed. Cir. 2017) ("Our review of *Lujan* and the Supreme Court's subsequent decisions leads us to conclude that the summary judgment burden of production applies in cases where an appellant seeks review of a final agency action and its standing comes into doubt."); *cf. All. For Env't Renewal*, 436 F.3d at 87–88 ("As in any case requiring determination of Article III standing,

once the Defendants' motion to dismiss for lack of jurisdiction under [Rule] 12(b)(1) put the Plaintiffs' Article III standing in issue, the [trial court] has leeway as to the procedure it wishes to follow." (footnotes omitted)).

On appeal, the Federal Circuit — not sitting *en banc*, but in a panel decision — concluded that the "interested party" issue "presents a question of statutory standing rather than Article III standing," which is not a controversial statement *per se*.  *CACI*, 67 F.4th at 1151.[19]  But the Federal Circuit then swept away decades of its own jurisprudence in holding that: (1) "[o]ur prior caselaw treating the interested party issue as a jurisdictional issue . . . is no longer good law[,]" *id.*; and (2) "the issue of prejudice is no longer jurisdictional *unless it implicates Article III considerations*, and our cases to the contrary are no longer good law[,]" *id.* at 1153 (emphasis added).  With respect to the latter point, the Federal Circuit further explained that "[t]he issue of prejudice can properly be resolved by the Claims Court initially *only if* under *Chenery* the issue need not be remanded to the agency, for example, if the issue is a purely legal question."  *Id.* at 1153-54 (emphasis added).[20]  Otherwise, "if the issue has not been addressed in the first instance by the contracting officer, a remand is necessary for the contracting officer to address the issue of prejudice."  *Id.* at 1154.

The analytical challenges and questions this raises regarding jurisdiction and prejudice determinations — with real-world implications for both litigants and this Court — are many.

*First*, as Judge Somers's repeated reliance on *Lujan* suggests, almost all plaintiffs who fail the "interested-party" test will have a difficult, if not impossible, time satisfying Article III's injury-in-fact (that is, prejudice) requirements, which *are* jurisdictional.  *See*

---

[19] Notably, *CACI* seems focused on the proposition that "so-called 'statutory standing' defects do not implicate a court's subject-matter jurisdiction."  *CACI*, *67* F.4th at 1151 (quoting *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1235 (Fed. Cir. 2019) (citing *Lexmark*, 572 U.S. at 128 n.4)).  But the Federal Circuit has always recognized that part of 28 U.S.C. § 1491(b)(1) addresses subject matter jurisdiction and part addresses standing, while both are jurisdictional: "Section 1491(b)(1) includes three related requirements that are pertinent to the jurisdictional inquiry in this case, with the first addressing the Court of Federal Claims' subject matter jurisdiction and the second and third addressing standing."  *Diaz*, 853 F.3d at 1357 (explaining that the subject matter jurisdiction prong encompasses an "action . . . objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement").

[20] In *Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1290-91 (Fed. Cir. 2020), the Federal Circuit described the circumstances under which remand to an agency is unnecessary, summarizing and applying the doctrinal rule from *SEC v. Chenery Corp.*, 318 U.S. 80 (1943).  Though the Federal Circuit referenced *Chenery* in its *CACI* decision, our appellate court cited only to *Oracle* on this point.  *CACI*, 67 F.4th at 1153-54.

*Weeks Marine*, 575 F.3d at 1361 (explaining that "Article III considerations require a [plaintiff] to make a showing of *some* prejudice." (citing *Lujan*, 504 U.S. at 560)).[21]  Indeed, in all but the most unusual cases,[22] a lack of prejudice for "interested-party" purposes may be easily reframed as a lack of injury-in-fact or of redressability in line with *Lujan.*

In *Thole v. U. S. Bank N.A.*, 590 U.S. -- , 140 S. Ct. 1615 (2020), for example, the Supreme Court considered whether participants in a defined-benefit pension plan had standing to maintain a putative class action against a former employer and others, alleging breach of duties of loyalty and prudence under the Employee Retirement Income Security Act.  The district court dismissed the case, and the United States Court of Appeals for the Eighth Circuit affirmed on the ground that the plaintiffs lacked statutory standing.  *Thole v. U. S. Bank N.A.*, 873 F.3d 617, 628 (8th Cir. 2017) (holding that "the plaintiffs no longer fall within the class of plaintiffs authorized to bring suit").  The Supreme Court affirmed, but not because of a lack of statutory standing; rather, the Court affirmed "on the ground that the plaintiffs lack Article III standing."  *Thole*, 140 S. Ct. at 1619 ("[Plaintiffs] have received all of their monthly benefit payments so far, and the outcome of this suit would not affect their future benefit payments.  If [plaintiffs] were to *lose* this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny less.  If [plaintiffs] were to *win* this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny more.  The plaintiffs therefore have no concrete stake in this lawsuit.").

Like *Thole*, the classic bid-protest example is a case where an offeror or bidder simply cannot win a procurement, whether because the allegations underlying a bid-

---

[21] *See also Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 694 n.27 (2010) ("The 'substantial chance' test for prejudice captures the remaining two requirements of Article III standing: 'injury in fact' (denial of an otherwise substantial chance of receiving the contract award) and 'causal connection' (but for the alleged errors in the procurement process)."), *abrogated on other grounds by Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326 (Fed. Cir. 2021).

[22] *AeroSpray* is an example of the rare case in which the plaintiff alleged an injury-in-fact sufficient for Article III requirements, but nevertheless failed to meet the "interested party" test.  *See Aero Spray*, 156 Fed. Cl. at 574 ("The likelihood of increased competition may constitute an injury in fact for Article III purposes, but it does not follow that Aero Spray's '*direct* economic interest' is impacted by the other awards. . . .").  Another case in which the distinction is important is where the would-be plaintiff is a potential subcontractor.  A potential subcontractor may suffer an injury-in-fact due to the government's procurement decision, but a subcontractor is not an actual or potential bidder and thus cannot qualify as an "interested party" for the purposes of 28 U.S.C. § 1491(b).  *See* Matthew H. Solomson & Jeffrey L. Handwerker, *Subcontractor Challenges to Federal Agency Procurement Actions*, 06-3 Briefing Papers 1, 4 (Feb. 2006) ("Because subcontractors are not actual or prospective bidders on a Government contract as required under CICA, *AFGE* and other Federal Circuit decisions following it appear to suggest that a subcontractor can never be an 'interested party' under the Tucker Act and thus cannot have standing to file a bid protest action in the [Court of Federal Claims].").

protest claim show that is the case or because the administrative record proves it.  That is arguably nothing more than an Article III standing defect, as *Acetris* illustrates, and is not just a more-limited statutory standing ("interested party") problem.[23]  In that regard, *CACI* itself recognizes that "issue[s] of prejudice" which "implicate[] Article III considerations" remain jurisdictional, 67 F.4th at 1153, and thus the Federal Circuit decisions adopting such an approach to prejudice, including *Acetris*, presumably remain good law.

Unfortunately, other parts of *CACI* suggest that we cannot be so confident. *Compare* 67 F.4th at 1553 ("Where, as here, issues of statutory standing and merits overlap and there is no *Chenery* exception, the Claims Court has no authority to conduct its own *de novo* determination of the issue based on a record made in the Claims Court."); *with Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 996 (Fed. Cir. 2021) (rejecting the "contention . . . that when the Claims Court determines in a bid-protest action that an aspect of the agency's decision was arbitrary and capricious, the defect in the agency's decision must be presumed to be prejudicial").  This raises a slew of questions.  May the government ever avoid filing the administrative record and proceeding to full-blown merits briefing by contending, for example, that a plaintiff did not submit a timely, compliant proposal?  More pertinently, if the administrative record conclusively demonstrates that the plaintiff is not prejudiced, is this Court now nonetheless required to remand the procurement to the agency for a contracting officer to determine prejudice on the merits?  The latter question is presented squarely in this case.

*Second*, *CACI* relied on *Lexmark*, 572 U.S. at 128 n.4, to conclude that prior Federal Circuit jurisprudence is no longer good law.  More than a few Federal Circuit decisions, however — including those discussed *supra* — post-date *Lexmark* and, thus, presumably were aware of intervening Supreme Court decisions.  The problem is that except for *Myers Investigative*, 275 F.3d 1366, the Federal Circuit in *CACI* does not identify which of its prior decisions are "no longer good law."  *CACI*, 67 F.4th at 1151.  *Acetris* once again illustrates the difficulty.  *CACI* cites *Acetris* with approval for the proposition that "[t]he standing issue here presents a question of statutory standing rather than Article III standing."  *CACI*, 67 F.4th at 1151 (citing *Acetris*, 949 F.3d at 727).  But, in *Acetris*, issued nearly six years(!) after *Lexmark*, the Federal Circuit itself explained that "*two phrases define the boundaries of section 1491(b)(1) jurisdiction*: (1) that the challenge be 'in connection with a procurement or a proposed procurement'; and (2) that the challenger be an 'interested

---

[23] *Thole*, 140 S. Ct. at 1622 ("Courts sometimes make standing law more complicated than it needs to be.  There is no ERISA exception to Article III.  And under ordinary Article III standing analysis, the plaintiffs lack Article III standing for a simple, commonsense reason: They have received all of their vested pension benefits so far, and they are legally entitled to receive the same monthly payments for the rest of their lives.  Winning or losing this suit would not change the plaintiffs' monthly pension benefits.  The plaintiffs have no concrete stake in this dispute and therefore lack Article III standing.").

party.'"  *Acetris*, 949 at 727 (emphasis added).  The *Acetris* panel no doubt deduced that conclusion from not only binding Federal Circuit precedent but also the plain language of the Tucker Act, as amended by ADRA, which, as mentioned already, vests this Court with "*jurisdiction* to render judgment on an action by an interested party . . . ."  28 U.S.C. § 1491(b)(1) (emphasis added).  So, is *Acetris* good law or not?

*Third*, the Federal Circuit's reliance on a footnote in *Lexmark* demands a greater explanation if it is to apply seamlessly in the Tucker Act context.[24]  The Tucker Act, including § 1491(b), is clearly both jurisdiction-granting and cause-of-action-creating, as the Federal Circuit has always recognized.  In contrast, in *Lexmark*, the statutory standing question was whether the plaintiff possessed a cause of action pursuant to 15 U.S.C. § 1125, a statute that contains no jurisdictional language.  Indeed, in *Lexmark*, "[t]he district court's jurisdiction arose under 28 U.S.C. §§ 1331 and 1367" — the general federal question and supplemental jurisdictional statutes, respectively.  *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 399 (6th Cir. 2012), *aff'd*, 572 U.S. 118 (2014).  This distinction is critical to the jurisdictional question (and the Tucker Act is hardly unique in that regard).  *See CNA v. United States*, 535 F.3d 132, 140 (3d Cir. 2008) (noting that the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–80, "defines federal courts' jurisdiction to hear cases seeking damages from the Government," explaining that "the conditions on the FTCA's waiver of sovereign immunity appear in the same statutory provision that grants jurisdiction," and holding that "FTCA plaintiffs must meet the criteria of § 1346(b)(1) before a district court may exercise jurisdiction").[25]  Indeed, the Supreme Court has held that statutory language may simultaneously define jurisdictional limits and create a cause of action.  In *Brownback v. King*, for example, the Supreme Court held that "in the unique context of the FTCA, all elements of a meritorious

---

[24] Here's another question:  if this Court concludes that a plaintiff is not an "interested party," and that now constitutes a decision on the merits — instead of a jurisdictional decision — is the finding a predicate for a *res judicata* argument precluding the would-be plaintiff from proceeding to district court under the APA as a non-interested party?  *Media Techs. Licensing, LLC. v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003) ("Because standing is jurisdictional, lack of standing precludes a ruling on the merits.").  The question is esoteric, but hardly theoretical.  *See Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 910–11 (10th Cir. 2004) (holding district courts retain jurisdiction "to hear cases challenging the government's contract procurement process so long as the case is brought by someone other than the actual or potential bidder"); *Validata Chem. Servs. v. Dep't of Energy*, 169 F. Supp. 3d 69, 84 (D.D.C. 2016) ("ADRA is both jurisdiction-conferring and, by implication, jurisdiction-denying. Thus, by reading the provision narrowly, the Federal Circuit limited the jurisdiction of the Court of Federal Claims but arguably expanded the jurisdiction of the federal district courts across the country."); *Aero Spray*, 156 Fed. Cl. at 561 (raising the question of whether "non-interested parties with APA standing [may] still maintain procurement-related actions in a district court").

[25] *See Pieczenik*, 2023 WL 5031507 at *2 n.3 (citing *CNA*, 535 F.3d at 153, and noting that the regional circuits having taken different procedural approaches to "early-stage factual attacks on intertwined merits questions").

claim are also jurisdictional."  592 U.S. --, 141 S. Ct. 740, 749 (2021) (holding that "an on-the-merits judgment can still trigger the [FTCA's] judgment bar, even if that determination necessarily deprives the court of subject-matter jurisdiction").[26]

Accordingly, in the FTCA context, the Supreme Court explained that a claim element may be "both a merit element of a claim and a jurisdictional element" but that "[t]he label does not change the lack of subject-matter jurisdiction" or whether "the claim fails on the merits."  *Brownback*, 141 S. Ct. at 750 n.8.  The Supreme Court in that case expressly concluded that "[b]ecause [plaintiff's] tort claims failed to survive a Rule 12(b)(6) motion to dismiss, the United States necessarily retained sovereign immunity, also depriving the court of subject-matter jurisdiction."  *Id.* at 749.  Indeed, the Federal Circuit itself has acknowledged that "where sovereign immunity is at issue, the failure-to-state-a-claim issue can be jurisdictional."  *Butte Cnty., Idaho v. United States,* 2022 WL 636101, at *4 n.4 (Fed. Cir. Mar. 4, 2022) (citing *Brownback*, 141 S. Ct. at 749-50).

In short, "*Brownback* holds that, when a jurisdictional issue subsumes a merits issue, courts may decide either one first."  *Jean-Baptiste v. Dep't of Justice*, 2023 WL 8600569, at *2 (D.D.C. Dec. 12, 2023).[27]  The similarities between the Tucker Act and the FTCA cannot be so easily ignored.  *Fid. & Guar. Ins. Underwriters, Inc. v. United States*, 805 F.3d 1082, 1092 (Fed. Cir. 2015) (noting that "in their respective waivers of sovereign immunity, both the Federal Tort Claims Act and the Tucker Act speak in terms of claims against the United States" and commenting that "[t]his is hardly surprising given that both statutes are couched in terms of the subject matter of the claims"); *Paret–Ruiz v. United States*, 827 F.3d 167, 176 (1st Cir. 2016) ("The Tucker Act is the constitutional analogue to the FTCA.  That is, like the FTCA, which waives sovereign immunity for tort

---

[26] *See also Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 177–78 (2017) ("Foreign sovereign immunity is jurisdictional in this case because explicit statutory language makes it so. . . .  A nonfrivolous argument to that effect is insufficient.").

[27] *See also Bourke v. United States*, 25 F.4th 486, 490 (7th Cir. 2022) (concluding that "the FTCA's waiver of sovereign immunity merges with the claim's substance and that a decision therefore should be treated as one on the merits" but that if a plaintiff "loses under the statute . . . immunity bars the suit—and then, as *Brownback* holds, the decision would be both on the merits and for lack of jurisdiction"); *Morales v. United States*, 2023 WL 2129580, at *4 (E.D.N.Y. Feb. 17, 2023) ("[B]ecause the FTCA functions as a waiver of sovereign immunity, a finding that a particular FTCA claim fails on the merits would also deprive a court of subject-matter jurisdiction." (citing *Brownback*, 141 S. Ct. at 749)); *Talignani v. United States*, 26 F.4th 379, 381 (7th Cir. 2022) (explaining that for FTCA claims, the "failure to establish any element also eliminates the basis for subject matter jurisdiction"); *but see Bourke*, 25 F.4th at 490 ("The Supreme Court deems some aspects of the Tort Claims Act to be jurisdictional, but even then it has concluded that the FTCA's waiver of sovereign immunity merges with the claim's substance and that a decision therefore should be treated as one on the merits.").

claims against the federal government, the Tucker Act waives sovereign immunity for constitutional claims against the United States.").[28]

The Federal Circuit in *CACI* held that statutory standing is not jurisdictional "even when the cause of action relies on a waiver of sovereign immunity." *CACI*, 67 F.4th at 1151 (citing *Wilkins v. United States*, 598 U.S. 152 (2023)). In *Wilkins*, the petitioners owned property in rural Montana bordering a road for which the government held an easement since 1962. The government claimed that the easement included public access, which petitioners disputed. The petitioners sued the government under the Quiet Title Act, which allows challenges to the United States' rights in real property. The government moved to dismiss based on the Act's 12-year time bar, 28 U.S.C. § 2409a(g). The Supreme Court sided with petitioners, holding that 28 U.S.C. § 2409a(g) "is a nonjurisdictional claims-processing rule," 598 U.S. at 155, because "Section 2409a(g) . . . lacks a jurisdictional clear statement." 598 U.S. at 159. In so holding, the Supreme Court pointed out the fact that "[t]he Quiet Title Act's jurisdictional grant is in 28 U.S.C. § 1346(f), well afield of § 2409a(g)." *Id.* (footnote omitted). But the Tucker Act's language is nearly identical to the very part of the Quiet Title Act the Supreme Court acknowledged *is* jurisdictional. *Compare* 28 U.S.C. § 1346(f) (providing that "[t]he district courts *shall have exclusive original jurisdiction* of civil actions under section 2409a") *with* 28 U.S.C. § 1491(a) ("The United States Court of Federal Claims *shall have jurisdiction* to render judgment upon any claim . . ." (emphasis added)), *and* § 1491(b) (providing that this Court "*shall have jurisdiction* to render judgment" on defined bid-protest "action[s]" (emphasis added)).

*Fourth*, how does prejudice work following *CACI*? *CACI* instructs that "[w]here . . . issues of statutory standing and merits overlap and there is no *Chenery* exception, the Claims Court has no authority to conduct its own *de novo* determination of the issue based on a record made in the Claims Court." 67 F.4th at 1553. But *CACI* qualifies that directive, indicating that "[t]his conclusion is not intended to suggest that the Claims Court cannot make jurisdictional determinations in the first instance." *Id.* at n.3. But jurisdictional (standing) and merits prejudice inquires will almost always have some overlap, as noted repeatedly *supra*, and as Judge Schwartz succinctly observed: "Although [analytically] distinct from a protestor's burden to show standing, the test for prejudice on the merits in bid protests generally involves the same inquiry." *eSimplicity, Inc. v. United States*, 162 Fed. Cl. 372, 380 (2022) (internal citation omitted); *see also Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1379 (Fed. Cir. 2009) ("The underlying question of prejudice [for standing] requires the trial court to engage in a factual analysis, which we review for clear

---

[28] *See also C.D.A. v. United States*, 2023 WL 2666064, at *12 (E.D. Pa. Mar. 28, 2023) ("As of today, Congress has implemented three major statutory waivers of sovereign immunity: the FTCA, the Tucker Act, and the [APA]. Thus, a suit against the United States must usually fall within the parameters of these three statutory waivers for a federal court to have jurisdiction over it." (internal citations omitted)).

error." (citing *Bannum,* 404 F.3d at 1354)).  Does this mean that we can make factual findings regarding prejudice for jurisdictional purposes but not merits determinations?  Where is the line?  In referring to "a record made in the [Court of Federal Claims]," did the Federal Circuit intend to include the administrative record or only the consideration of new evidence not properly contained in the administrative record?  Where this Court is convinced that the administrative record demonstrates a lack of prejudice, may we frame our prejudice determination in terms of Article III injury-in-fact (per *Lujan* and *Davis*)?  This Court is not quite sure what the Federal Circuit intended.

*Finally*, and no doubt most controversially, is *CACI* itself "good law"?  Can the *CACI* panel legitimately claim to have overturned Federal Circuit precedent by invoking a years-old Supreme Court decision?  Earlier Federal Circuit panel decisions are binding on later panels, until the Federal Circuit overrules the precedent *en banc*.  *Metzinger v. Dep't of Veterans Affs.*, 20 F.4th 778, 781 (Fed. Cir. 2021) ("[W]e are bound by prior panel decisions of this court unless and until overturned en banc.").  But what should a trial court do where this rule is not followed?  Such a situation has arisen in at least one other circuit and the lower district courts have elected to follow the earlier panel decision.  *See, e.g., Buckingham v. Booz Allen Hamilton, Inc.*, 64 F. Supp. 3d 981, 984–85 (S.D. Tex. 2014) ("[T]his Court must follow the earlier ruling…"); *Storr v. Alcorn State Univ.*, 2017 WL 3471191, at *4 (S.D. Miss. Aug. 11, 2017) ("Until the Fifth Circuit resolves this issue, the rule of orderliness applies, and the earlier-decided [decision] should be followed. . . . A solid majority of districts within the circuit have reached the same conclusion.").[29]

The Federal Circuit itself appears to have rejected the notion that its panels can overrule precedent based on an intervening Supreme Court decision, as Judge Allegra explained at length in *Jicarilla Apache Nation v. United States.*  100 Fed. Cl. 726, 733–34 (2011) (discussing *El–Shifa Pharmaceutical Industries Co. v. United States,* 378 F.3d 1346, 1352  (Fed. Cir. 2004) (noting that "to overrule a precedent," even based upon an intervening Supreme Court decision, "the court must rule en banc"), *cert. denied,* 545 U.S. 1139 (2005)); *but see Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014) ("It is established that a later panel can recognize that the court's earlier decision has been implicitly overruled as inconsistent with intervening Supreme Court authority.").

Notwithstanding the considerable uncertainties arising from *CACI*, this Court must do its best to harmonize the various binding authorities discussed *supra* in order to determine: (1) whether this Court has subject matter jurisdiction over Superior's complaint; (2) whether Superior has demonstrated Article III and/or statutory standing;

---

[29] *Cf. Entergy Nuclear FitzPatrick, LLC v. United States*, 101 Fed. Cl. 464, 473 (2011) (explaining that "this Court is in the unenviable position wherein it finds that a panel decision of its appellate body contradicts an earlier decision of that same court, a decision that moreover was rendered en banc," noting that "the members of the later panel were all members of the majority in the en banc decision," and following the earlier decision), *aff'd*, 711 F.3d 1382 (Fed. Cir. 2013).

and (3) whether Superior has demonstrated prejudice (including whether that is a merits issue or one with jurisdictional implications).

### C. Superior's Complaint States a Claim within this Court's Jurisdiction and Demonstrates Standing

There is no question that Superior's bid protest claims constitute proper subject matter for this Court pursuant to 28 U.S.C. § 1491(b) as Superior makes non-frivolous, non-conclusory allegations of fact supporting the claim that the government improperly awarded a contract to Nisou in violation of the FAR and the IFB. Standing, however, presents a more difficult issue in this case. In that regard, the GAO, as noted *supra*, determined that Superior did *not* qualify as an interested party to challenge the contract award to Nisou. That is because CVICS was lower-priced than Superior and thus ahead of Superior in line for award; in other words, even if Nisou's bid was fatally defective, Superior could not win the procurement. GAO thus explained:

> [W]e have found no basis to disturb the contracting officer's decision to accept and consider the CVICS bid. Therefore, there is an otherwise acceptable, lower-priced bidder who would be in line for award even if the protest challenges relating to the evaluation of Nisou's bid were sustained. Accordingly, we conclude [Superior] is not an interested party to pursue these remaining protest grounds.

*Superior Waste Mgmt.*, LLC, B-421022, 2022 CPD ¶ 317, 2022 WL 17741595, *8 (Dec. 15, 2022), AR 2309.

Anticipating that the government would raise a similar standing challenge in this case, *see* Compl. ¶ 15, Superior alleges that both "Nisou's and CVICS' bid are fatally unbalanced and not eligible for award." Compl. ¶ 57; *see also id.* ¶ 68 (alleging that the government "did not analyze or document any conclusions regarding whether Nisou's or CVICS' bids present an unacceptable level of risk to the government"). Indeed, Superior dedicates Count IV of its complaint to the claim that CVICS' bid should have been rejected "as late and non-responsive under the terms and conditions of the IFB." Compl. ¶ 80. The point of Superior's challenge to CVICS is exclusively to move itself into the putative second-place spot, as it were, to establish standing for the purpose of contesting Nisou's award. Pl. MJAR at 29 ("Absent the Agency's erroneous consideration of CVICS' bid, there is no argument that [Superior] lacks standing to pursue this protest as the next lowest responsible and responsive bidder in line for award."); *see also* Compl. ¶ 16 ("The Agency's standing argument (if any) must fail because CVICS is not a responsive bidder under the terms and conditions of the IFB.").

The government, in response, does not contest Superior's challenge to CVICS (or Superior's standing) and thus maintains that Superior's "arguments [regarding CVICS] are irrelevant to the dispositive issue of whether the Army's award to Nisou was proper." Def. MJAR at 35. The government is correct, and accordingly this Court does not further address Superior's allegations regarding CVICS.

Nevertheless, this Court has a duty to verify that Superior has Article III standing. *See* RCFC 12(h)(3). At the outset, the Court notes that Superior invokes the wrong "interested party" test in its complaint (in a section entitled "Jurisdiction and Standing"), in asserting that Superior "has a direct economic interest in this matter and a *non-trivial competitive injury that can be remedied by the requested relief.*" Compl. ¶ 14 (emphasis added). That is the pre-award "interested party" test that applies, for example, to a plaintiff objecting to the terms of a solicitation. *Weeks Marine*, 575 F.3d at 1362. In this case, however, where the government has made an award, the question is whether Superior is an "actual or prospective bidder[] or offeror[ ] whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *CACI*, 67 F.4th at 1151 (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (emphasis and citation omitted)). In turn, to show "a direct economic interest," Superior must allege facts demonstrating "that it had a 'substantial chance' of winning the contract." *Id.* (quoting *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (quoting *Rex Serv.*, 448 F.3d at 1308))). Quite apart from the statutory "interested party" requirement, however, the Court does not see how Superior suffered an injury-in-fact sufficient for Article III standing if Superior fails to allege facts demonstrating that the government committed prejudicial error.[30]

Superior alleges that it "submitted a conforming bid in response to the IFB." Compl. ¶ 14. Unlike in *CACI*, the government does not dispute this or any other jurisdictional fact via a 12(b)(1) motion. The Court thus accepts Superior's allegation as true and concludes that Superior is an actual bidder, a fact the administrative record also supports in any event. *See* AR 733, 992. In contrast, Superior's allegations related to prejudice are thin and conclusory to the extent they are made at all. Superior alleges that "[t]his Court should set aside the award to Nisou because [the Army's] unbalance[d] pricing analysis was arbitrary, capricious, and not in accordance with the IFB or the governing law." Compl. ¶ 69. But it is not enough to show an error in the award process. Superior must allege facts showing a *prejudicial* error: *i.e.*, but for the government's error,

---

[30] For example, if Superior had not submitted a timely bid or submitted one that was materially noncompliant with the IFB — or is otherwise ineligible for a contract award — the Court does not see how Superior could have Article III standing to challenge the CO's responsibility determinations or pricing analysis. A stranger to the procurement at issue has not suffered an injury-in-fact, particularly not after contract award, even assuming the government erred in the bid evaluation process. *See Acetris*, 949 F.3d at 726–27.

Superior had a substantial chance — or a "greater than an insubstantial chance," *Am. Relocation Connections*, 789 F. App'x at 227 — of winning the contract.

The Court nevertheless concludes that Superior has alleged sufficient facts, which when assumed to be true plausibly demonstrate, for the sake of establishing Article III standing at the complaint stage, that: (1) the award to Nisou is arbitrary, capricious, or otherwise contrary to law; (2) CVICS is ineligible for award; and, thus, (3) Superior would be "the lowest-price responsive and responsible bidder, and should have received the Contract award." Compl. ¶ 19. This is sufficient for "interested party" (statutory) standing as well, at least at the complaint stage. Accordingly, and particularly in the absence of either an express facial or factual attack on jurisdictional facts, including prejudice, this Court evaluates the parties' MJARs. This is *not*, however, a finding that Superior succeeds in demonstrating prejudice based on the administrative record, for the purposes of obtaining relief. Rather, consistent with *CACI* and *American Relocation*, the prejudice issues in this case are best dealt with by resolving the parties' MJARs on the merits. To the extent such a merits determination necessarily has standing implications, a dismissal based on RCFC 12(b)(1) also may be appropriate. *See Brownback*, 141 S. Ct. at 750 n.8; *MSP Recovery Claims Series LLC v. Farmers Ins. Exch.*, 2023 WL 6633838, at *2 (9th Cir. Oct. 12, 2023) (holding that "'an on-the-merits judgment' is valid even if the reasons the claim fails also have implications for jurisdiction"); *cf. Bolivarian Republic*, 581 U.S. at 178 ("We recognize that merits and jurisdiction will sometimes come intertwined. . . . If so, the court must still answer the jurisdictional question. If to do so, it must inevitably decide some, or all, of the merits issues, so be it.").[31]

## III.   STANDARD OF REVIEW

### A.   APA Review

Pursuant to 28 U.S.C. § 1491(b)(4), this Court applies the standard of review contained in the Administrative Procedure Act ("APA") § 10(e), 5 U.S.C. § 706. *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019). In accordance with the APA, this Court reviews an agency's procurement decisions to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A plaintiff succeeds on the merits where it demonstrates that either:

---

[31] *See also Diaz v. Loc. No. 241, Transp. Workers Union of Am., Univ. Div.*, 2021 WL 1063184, at *10 (S.D.N.Y. Mar. 19, 2021) ("In reviewing whether Plaintiffs have established a material issue of fact regarding an injury-in-fact, the merits and Article III standing analysis merge. Thus, Plaintiffs' failure to establish an injury-in-fact entitles Defendants to prevail on the merits as well as standing. But, because Article III standing is jurisdictional, this Court must dismiss Plaintiffs' claims for lack of Article III standing rather than on the merits." (citations omitted)).

"(1) the [agency]'s decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted).

An agency's decision is arbitrary and capricious under the APA standard of review if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015) (quoting *Ala. Aircraft Indus.*, 586 F.3d at 1375); *Sharpe v. United States*, 935 F.3d 1352, 1358–59 (Fed. Cir. 2019).

## B.  The Role of the Administrative Record and this Court's Fact Finding

This Court conducts its APA assessment of the government's challenged procurement decision(s) — in an action pursuant to 28 U.S.C. § 1491(b) — via motions for judgment on the administrative record, RCFC 52.1(c), a process "properly understood as intending to provide for an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  The process specifically is "designed to provide for trial on a paper record, *allowing fact-finding by the trial court*." *Id.* (emphasis added).  In deciding cross-motions for judgment on the administrative record, this Court considers "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record." *XOtech, LLC v. United States*, 950 F.3d 1376, 1380 (Fed. Cir. 2020) (quoting *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018)); *see also Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021).

The primary difference between a typical trial and one conducted on the administrative record is that, in the latter, new evidence ordinarily may not be considered.  Both the nature of APA review and this Court's rules "restricts the evidence to the agency record, as may be supplemented consistent with [the law of this circuit]." *Bannum*, 404 F.3d at 1356.

## C.  Determining Prejudice on the Merits

The Federal Circuit has instructed that "[t]he trial court [is] *required* to determine whether . . . errors in the procurement process significantly prejudiced [a plaintiff]." *Bannum*, 404 F.3d at 1353 (emphasis added); *id.* at 1356 (holding that "the trial court [is] required] to make factual findings on prejudice from the record evidence").[32]  In a post-

---

[32] Thus, the Federal Circuit noted that it "reviews such [factual] findings for clear error." *Bannum*, 404 F.3d at 1354 ("Nor should the review of a Court of Federal Claims prejudice determination

award protest, the plaintiff bears the burden of showing not only that the agency's decision is flawed under the APA standard of review but also that some prejudice flowed from that error.  In short, a plaintiff "must show that there was a 'substantial chance' it would have received the contract award but for the errors."  *Id.* at 1353 (citing *Info. Tech.,* 316 F.3d at 1319, and *Alfa Laval,* 175 F.3d at 1367).[33]

The Federal Circuit has recently reconfirmed not only that a plaintiff bears the burden to prove prejudice, but also that the rule is based firmly on Supreme Court precedent:

> The standards of the [APA] set forth in 5 U.S.C § 706 govern judicial review of agency action in bid protests.  28 U.S.C. § 1491(b)(4).  The APA provision mandates that when a court reviews agency action for being "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "due account shall be taken of the rule of prejudicial error."  5 U.S.C. § 706. The Supreme Court has explained that the prejudicial-error rule applies the harmless-error standard to review of administrative agency action.  *Shinseki v. Sanders*, 556 U.S. 396, 406–07, 129 S.Ct. 1696, 173 L.Ed.2d 532 (2009).  In particular, the challenger of agency action generally bears the burden of showing that an error was harmful—that is, that it was prejudicial.  *Id.* at 409–10, 129 S.Ct. 1696.

*Sys. Stud. & Simulation*, 22 F.4th at 996–97 (explaining that Federal Circuit "precedent accord[s] with the APA mandate" and "prescribe[s] a two-step process when deciding

---

be premised on an 'arbitrary and capricious' review.  That review standard goes to the agency's compliance with the law, whereas the prejudice determination assesses whether an adjudged violation of law warrants setting aside a contract award."); *id.* at 1357 ("[T]he trial court's factual determination on prejudice . . . is entitled to review for clear error like any finding in a bench trial, and the special concerns applicable to bid protest actions do not alter that review here.").

[33] *See also Noble Supply & Logistics LLC v. United States,* -- Fed. Cl. --, 2023 WL 8001134, at *6 (Fed. Cl. Nov. 17, 2023) (Hertling, J.) ("[T]he court holds a trial on the administrative record and must determine whether a party has met its burden of proof based solely on the evidence contained in that record." (citing *Bannum,* 404 F.3d at 1355)); *Navarre Corp. v. United States,* -- Fed. Cl. --, 2023 WL 7392382, at *5 (Fed. Cl. Oct. 23, 2023) (Smith, S.J.) (explaining that "the parties are limited to the administrative record, and the Court must make findings of fact as if it were conducting a trial on a paper record" and "will then determine whether a party has met its burden of proof based on the evidence in the record" (*Bannum,* 404 F.3d at 1354-55)); *Karthik Consulting, LLC v. United States,* -- Fed. Cl. --, 2023 WL 7009625, at *5 (Fed. Cl. Oct. 4, 2023) (Dietz, J.) ("The protestor has the burden to show by a preponderance of evidence the arbitrary and capricious nature of the agency's decision.").

whether to set aside a contract award, covering both irrationality errors and legal errors" (citing *Bannum*, 404 F.3d at 1351, among other decisions)).

The requirement to determine whether an agency's error was prejudicial to the plaintiff "is always required before setting aside a bid award, regardless of whether the error identified at the first step was arbitrary and capricious action or, instead, a violation of law." *Sys. Stud. & Simulation,* 22 F.4th at 996–97 (citing *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 n.6 (Fed. Cir. 2021) ("The APA does not provide an exception to the prejudicial-error rule for arbitrary and capricious action.")).   Specifically, "[d]emonstrating prejudice" requires that "the plaintiff show more than a bare possibility of receiving the award."   *Id.* (citing *Bannum*, 404 F.3d at 1358, where the Federal Circuit affirmed the trial court's determination that the plaintiff had not demonstrated a substantial chance of award because its "argument rest[ed] on mere numerical possibility, not evidence").

The Federal Circuit provided this summary of the required prejudice analysis when resolving the merits of an action pursuant 28 U.S.C. § 1491(b):

> [T]here is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision. The protestor must show prejudice under the usual standard. The Supreme Court has noted that, at least in some contexts, prejudice will be easily shown because the circumstances will make prejudice readily apparent. *Shinseki*, 556 U.S. at 410, 129 S.Ct. 1696. But even if that may sometimes be true in particular bid-protest cases, there is no starting point of presumed prejudice.

*Sys. Stud. & Simulation,* 22 F.4th at 998.   The Federal Circuit further reaffirmed that it "review[s] the legal standard for prejudice de novo," but this Court's "factual findings underlying the prejudice determination for clear error."   *Id.* (citing *WellPoint Military Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (citing *Bannum*, 404 F.3d at 1353–54)).[34]

### D.  How Does *CACI* Color Prejudice Determinations?

In *CACI*, as noted *supra*, the Federal Circuit held that "[t]he issue of prejudice can properly be resolved by the Claims Court initially *only if* under *Chenery* the issue need not be remanded to the agency, for example, if the issue is a purely legal question[.]"   67

---

[34] In *Sys. Stud. & Simulation, Inc.*, the Federal Circuit, based on the trial court's specific fact findings, "conclude[d] that the Claims Court did not err when it determined that the irrational assignment of the particular strength at issue to CAE was harmless error."   22 F.4th at 998.

F.4th at 1153–54 (citing *Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1291 (Fed. Cir. 2020) (emphasis added)).  Thus, under *CACI*, "[t]ypically, . . . if the [prejudice] issue has not been addressed in the first instance by the contracting officer, a remand is necessary for the contracting officer to address the issue of prejudice."  *Id.* at 1154.

A broad reading of *CACI* on this point cannot be reconciled with the mountain of Federal Circuit precedent this Court addressed above — which *CACI* did not expressly overrule — let alone the Federal Circuit's fairly recent decision in *Oracle*, 975 F.3d 1279.

In *Oracle*, the eponymous plaintiff challenged the Defense Department's decision to conduct a single-award contract instead of a multiple-award contract.  975 F.3d at 1285.  Oracle asserted that the government's approach violated 10 U.S.C. § 2304a(d)(3)(A), which, absent an exception, prohibits awarding a large task order contract to a single vendor.  *Oracle*, 975 F.3d at 1284.  Ruling on motions for judgment on the administrative record, Judge Bruggink sided with Oracle regarding the alleged statutory violation, holding "that the solicitation did not qualify for a single-source award under the exception . . . to the statutory prohibition."  *Id.* at 1286.  But that determination alone did not resolve the case.  The parties further debated the putative prejudice resulting from the statutory violation.  Oracle argued that if the government had employed a multiple-award procurement as required, certain "gate criteria" that precluded Oracle from competing "might have been different in that setting."  *Id.*  In response, the government argued that "the agency's minimum security needs would not have changed in a multiple-award scenario" and that "the Department still would have insisted on" the gate criteria that kept Oracle from competing.  *Id.*

Judge Bruggink sided with the government on the prejudice question.  Based on the administrative record, he concluded that a critical aspect of the gate criteria — related to data security — "represented the Department's minimum level of security required for processing and storing the Department's least sensitive information." *Oracle*, 975 F.3d at 1286.  Because the trial court had "no reason to doubt" that the data security requirements represented the agency's minimum requirements, the trial court concluded *without further remand* that "the agency's security concerns would not change," and that Oracle "would not stand a better chance of being awarded this contract if the agency determined that the procurement must be changed to multiple award."  *Id.* at 1287 (quoting *Oracle Am., Inc. v. United States*, 144 Fed. Cl. 88, 116 (2019)).  "The [trial] court therefore concluded that the decision to proceed with the procurement on a single-source basis did not prejudice Oracle."  *Id.*[35]  The Federal Circuit noted that Judge Bruggink's prejudice determination was "[b]ased on that evidence" in the administrative record.  *Id.*

---

[35] *See also Oracle*, 975 F.3d at 1288–89 ("Although the Claims Court agreed with Oracle that the Department committed legal error with respect to the ground it invoked to justify the use of a single-source procurement, the court found the error to be harmless. The court concluded that the error was harmless because even if the Department had opted for a multi-source procurement, Oracle would not have been able to satisfy the requirements of Gate 1.2, which the Department

On appeal, Oracle challenged Judge Bruggink's "harmless error analysis." *Oracle*, 975 F.3d at 1290.  Oracle argued that the trial court "erred by accepting the government's argument that under a multiple-award solicitation the Department would still have insisted on imposing" data security gate requirement.  *Id.*  According to Oracle, that is a decision that "should have been made by the agency" and not the trial court, consistent with *SEC v. Chenery Corp.*, 318 U.S. 80 (1943).  *Id.*  In short, Oracle maintained "that the Claims Court should not have 'presume[d] how DoD would structure a multiple-award procurement as DoD must make that decision in the first instance.'"  *Id.* (quoting Oracle's brief).

Addressing Oracle's contentions, the Federal Circuit began by noting that "[t]he Supreme Court has referred to the *Chenery* doctrine as embodying a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action."  *Oracle*, 975 F.3d at 1290 (cleaned up) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. ––, 140 S. Ct. 1891, 1907 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015))).  But *Chenery* "does not invariably require a remand to the agency" for every APA violation:

> As the Supreme Court, this court, and other circuit courts have recognized, principles of harmless error apply to judicial review of agency action generally.  A remand is unnecessary when the error in question "clearly had no bearing on the procedure used or the substance of decision reached," *Mass. Trs. Of E. Gas & Fuel Assocs. V. United States*, 377 U.S. 235, 248, 84 S.Ct. 1236, 12 L.Ed.2d 268 (1964); if there is no reason to believe that the decision would have been different, *In re Watts*, 354 F.3d 1362, 1370 (Fed. Cir. 2004); if it is clear that the agency would have reached the same result, *Fleshman v. West*, 138 F.3d 1429, 1433 (Fed. Cir. 1998); if the result is "foreordained," *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1036 (7th Cir. 1984); if the court is not "in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed," *Kurzon v. U.S. Postal Serv.*, 539 F.2d 788, 796 (1st Cir. 1976); or where there is no "significant chance that but for the error, the agency might have reached a different result," *NLRB v. Am. Geri-Care, Inc.*, 697 F.2d 56, 64 (2d Cir. 1982).

---

would have imposed regardless of whether the procurement was conducted on a single-source or multi-source basis."); *id.* at 1290 (noting trial court's determination that "because Oracle would not have been able to satisfy those requirements, it would have had no chance of a contract award, so the flaw in the procurement process did not harm Oracle").

*Oracle*, 975 F.3d at 1290–91.

Applying those rules, the Federal Circuit held that "[i]n light of the Claims Court's ***careful consideration of the record evidence***, the court's conclusion that the Defense Department would have included Gate 1.2 even if it had modified the solicitation to allow for multiple awards, and that Oracle therefore would not have had a substantial chance of securing the contract, is not clearly erroneous." *Oracle*, 975 F.3d at 1291–92 (emphasis added). Accordingly, the appellate court declined to "disturb the Claims Court's determination that the case did not need to be remanded to the Defense Department for a further determination whether a single-source award is appropriate." *Id.* at 1292.  In so holding, the Federal Circuit reiterated that it "review[s] a finding of prejudice or no prejudice by the Claims Court in a trial on an administrative record under the clearly erroneous standard." *Id.* at 1291 (citing cases).[36]

*CACI* does not purport to overturn *Oracle* or the mounds of Federal Circuit case law instructing this Court: (1) to make findings of fact based on the administrative record pursuant to this Court's rule governing motions for judgment on the administrative record, RCFC 52.1; and (2) to do so specifically regarding prejudice.  Nor, as a panel decision, could *CACI* be read to overturn such precedent.  The challenge, then, is to harmonize the decisions.

Attempting to harmonize *CACI* with *Oracle*, this Court concludes that the primary concern of *Chenery* — particularly in view of *Regents* — is that a trial court should not review agency action on grounds not invoked by the government or via the review of evidence not contained in the administrative record.  In other words, we should not permit *post hoc* rationalizations to require a remand where no prejudice is evident in the record, any more than we should deny a remand where prejudice is evident. *Regents*, 140 S. Ct. at 1907, 1909 (directing that "judicial review of agency action is limited to the grounds that the agency invoked when it took the action" and concluding that "[a]n agency must defend its actions based on the reasons it gave when it acted," while *post hoc* rationalizations for agency action are "impermissible" (internal quotations omitted)); *Kennedy v. Kijakazi*, 2023 WL 1990303, at *1 (7th Cir. Feb. 14, 2023) (citing *Chenery*, 318 U.S. at 95, for the proposition that "the agency may not substitute other reasons on appeal for its decision"); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010), *as amended on reh'g in part* (May 12, 2010) (concluding that "the *Chenery* doctrine . . . forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced").  There are good reasons for that limitation: "'[c]onsidering only contemporaneous explanations

---

[36] The Federal Circuit cited *Office Design Grp. v. United States*, 951 F.3d 1366, 1374 (Fed. Cir. 2020); *CliniComp*, 904 F.3d at 1359; *Diaz*, 853 F.3d at 1359; and *Bannum*, 404 F.3d at 1354.  In each case, the Federal Circuit held that "[p]rejudice is a question of fact that we review for clear error."  951 F.3d at 1374; *see CliniComp*, 904 F.3d at 1359 (holding that "[p]rejudice is a fact question," finding "no clear error," and "therefore conclud[ing] that CliniComp lacks standing in this bid protest").

for agency action' instills confidence that later explanations are not mere convenient litigating positions." *SAGAM Securite Senegal v. United States*, -- F.App'x --, 2023 WL 6632915, at *5 (Fed. Cir. Oct. 12, 2023) (quoting *Regents*, 140 S. Ct. at 1909).  Moreover, "[r]eview of the administrative record is vital because permitting agencies to invoke *post hoc* justifications can upset the orderly functioning of the process of review, forcing both litigants and courts to chase a moving target." *Vista Health Plan, Inc. v. United States Dep't of Health & Hum. Servs.*, 2020 WL 6380206, at *4 (W.D. Tex. Sept. 21, 2020) (citing *Regents*, 140 S. Ct. at 1909), *aff'd*, 29 F.4th 210 (5th Cir. 2022), *withdrawn and superseded by* 31 F.4th 946 (5th Cir. 2022).

There is a significant difference, however, between a court's considering whether an agency's decision meets the APA standard of review without regard to *post hoc* agency explanations and whether the administrative record demonstrates that any error is prejudicial.  *Oracle*, 975 F.3d at 1290-91.  In short, neither *Regents* nor *Chenery* precludes this Court from making factual findings on the administrative record regarding prejudice, just as the Federal Circuit has directed us to do for decades.  Indeed, the Supreme Court has made quite clear that the burden to demonstrate prejudice, based on the administrative record, rests with the plaintiff.  *Shinseki*, 556 U.S. at 408 (rejecting Federal Circuit approach that "would require the reviewing court to find [an] error prejudicial even if that court, having read the entire record, conscientiously concludes the contrary").  Notably, in *Shinseki*, the Supreme Court did not even mention *Chenery* as a concern.  *Cf. Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (rejecting plaintiff's reliance on *Chenery*, 318 U.S. at 87, "for the proposition that a reviewing court may not affirm an agency decision based on reasoning that the agency itself never considered in its administrative proceedings" because "even assuming *Chenery* is applicable, any error is reviewed under the harmless error doctrine").

Admittedly, this reading of *CACI* is difficult to square with some of its language.  But *CACI* is, on its facts, something of an outlier case because the OCI situation is unique — or at least relatively rare — due to regulations that govern OCI determinations but are not present in most bid protest cases.  Notably, the governing FAR provision in *CACI* *requires* the contracting officer to permit a contractor "a reasonable opportunity to respond" to conflict allegations prior to the contracting officer's deciding that an OCI precludes the contractor from receiving a contract award.  67 F.4th at 1154 (quoting FAR 9.504(e)).  But that is exceptional. For instance, Superior, in the present case, is not guaranteed any such opportunity under the FAR or any other authority, and Superior makes no such argument.  In *CACI*, by contrast, such a consideration played a central role, as the Federal Circuit concluded that "a declaration from a contracting officer as to how she would resolve the case is no substitute for a remand where the challenging party would have a full opportunity to present the case to the contracting officer."  *Id.*  That sounds to this Court like the Federal Circuit's concern was the *post hoc* justification

problem addressed in *Regents*, and plaintiff's ability to counter the justification before the agency in a regulation-mandated procedure.[37]

Emphasizing that a contracting officer is not permitted to offer a *post hoc* rationale to validate agency action — and that this Court is not permitted to consider such an explanation — is different from this Court's finding either (1) that a plaintiff has failed to carry its burden to demonstrate prejudicial error, or (2) harmless error based on *facts* in the administrative record.  Indeed, if this Court were required to remand a case to an agency for literally every decision that conceivably involves what a contracting officer might decide, a plaintiff's burden to prove prejudice (in order to obtain relief) would be effectively eliminated.  This Court cannot infer that the Federal Circuit intended in *CACI* to establish such an anomalous *per se* rule.  *See Texas Tech Physicians Assocs. v. United States Dep't of Health & Hum. Servs.*, 917 F.3d 837, 847 (5th Cir. 2019) ("The administrative harmless error rule can sit uneasily alongside the *Chenery* doctrine, which typically confines judicial review to the agency's reasoning. But that tension arises when a reviewing court makes findings the agency should have made in the first instance. *Chenery* cautions against intruding onto an agency's turf, not against giving an agency's own findings their obvious effect." (internal citations omitted)).

## IV.  THE COURT DENIES SUPERIOR'S MOTION TO SUPPLEMENT THE RECORD

### A. Supplementing the Administrative Record is Proper Only in Limited Circumstances

The Federal Circuit has set a high bar for plaintiffs seeking to supplement the administrative record.  *Axiom Resource Management, Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (holding that "supplementation of the record should be limited to cases in which the omission of *extra-record evidence* precludes effective judicial review" (emphasis added) (internal quotations omitted)).  The basic principle undergirding the high bar is "to guard against courts using new evidence to 'convert the arbitrary and capricious standard into effectively de novo review.'" *Axiom*, 564 F.3d at 1380 (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd,* 398 F.3d 1342 (Fed. Cir. 2005)); *see also Lewis v. United States*, 476 F. App'x 240, 243 n.2 (Fed. Cir. 2012) (citing cases for the proposition that supplementation or extra-record evidence exceptions "apply only under extraordinary circumstances" (quoting *Voyageurs Nat. Park Ass'n v. Norton,* 381 F.3d 759, 766 (8th Cir. 2004))).

---

[37] *But see Todd Const., L.P. v. United States*, 656 F.3d 1306, 1316 (Fed. Cir. 2011) (explaining that where "alleged procedural violations . . . do not fall into the category of fundamental procedural rights[,] . . . [the plaintiff] is required to show prejudice[,]" and holding that because the plaintiff "did not allege that if the required procedures had been followed, it would have taken curative action or that the performance evaluation would have been different[,] . . . [the plaintiff] lacks standing to sue with respect to the procedural violations").

Our Court has not clearly defined supplementation as the addition of evidence that the agency considered but omitted from the record.  To the contrary, "allowing the record to be supplemented by evidence that the agency considered but did not include in the record might be viewed as not supplementation at all, but merely requiring that the administrative record be complete." *Murakami*, 46 Fed. Cl. at 735 n.4.  Nevertheless, this Court has determined that precedent from other circuits, providing limited exceptions justifying a court's review of supplemental evidence, is instructive and persuasive.  *Naval Sys., Inc. v. United States*, 153 Fed. Cl. 166, 179 (2021).[38]

Thus, in *Axiom*, the Federal Circuit emphasized that "the parties' ability to supplement the administrative record is limited," 564 F.3d at 1379, such that the "focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA," *id.* at 1381.  The Federal Circuit's binding decision in *Axiom* — consistent with Supreme Court jurisprudence — ultimately requires that we determine whether supplementation of the administrative record is "necessary in order not 'to frustrate effective judicial review.'"  *Id.* (quoting *Camp,* 411 U.S. at 142–43).  Similarly, in an earlier decision, the Federal Circuit held that discovery or record supplementation is justified when "required for meaningful judicial review," *Impresa Construzioni,* 238 F.3d at 1338.  This Court has long included in that category cases in which "the record is insufficient for the Court to render a decision." *Portfolio Disposition Mgmt. Group, LLC v. United States,* 64 Fed. Cl. 1, 12 (2005) (citing *Impresa Construzioni*, 238 F.3d. at 1338-39).  In limited circumstances, "[t]he Supreme Court's . . . decision in *LTV,* and earlier decisions in *Overton Park* and *Pitts,* make clear that, even if the agency is not obligated to provide reasons [for its decision], a court may nonetheless order the agency to provide explanation if such an explanation is required for meaningful judicial review." *Impresa Construzioni*, 238 F.3d at 1337–38 (citing *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).[39]

---

[38] Those exceptions, as identified by the D.C. Circuit, are "(1) when the agency failed to examine all relevant factors; (2) when the agency failed to explain adequately its grounds for its decision; (3) when the agency acted in bad faith; or (4) when the agency engaged in improper behavior." *Naval Sys.,* 153 Fed. Cl. at 179 (citing *Nat'l Min. Ass'n v. Jackson,* 856 F. Supp. 2d 150, 156-57 (D.D.C. 2012)).

[39] For plaintiffs seeking discovery in a record review case, Supreme Court decisions also require trial courts to recognize that "the agency decision is entitled to a presumption of regularity." *Impresa Construzioni*, 238 F.3d at 1337–38 (citing *Bowen v. Am. Hosp. Assn.,* 476 U.S. 610, 626–27 (1986), *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 n. 9 (1983), *United States v. Chem. Found., Inc.,* 272 U.S. 1, 14–15 (1926)).  "Because of that presumption of regularity, the agency should not be required to provide an explanation [of its decision] unless that presumption has been rebutted by record evidence suggesting that the agency decision is

Accordingly, this Court should refuse "to supplement the record," to permit further "discovery," or "to otherwise add to the record evidence, not previously possessed by the agency" merely because the proponent of such measures believes that it will "improve the court's 'understanding' of a case." *NEQ, LLC v. United States*, 86 Fed. Cl. 592, 593 (2009) (reasoning that "the theoretical bases for considering such materials are questionable, at best, and derive from portions of the opinion in *Esch v. Yeutter* . . . that appear to be in heavy tension with numerous Supreme Court precedents"). In sum, while the Federal Circuit has approved the deposition of a contracting officer, for example to "explain[ ] the basis for his responsibility decision . . . it did so recognizing that the circumstances warranting such a deposition are 'rare.'" *NEQ*, 86 Fed. Cl. at 593–94 (quoting *Impresa Construzioni*, 238 F.3d at 1338, and explaining that "[t]he court, therefore, did not hold that depositions in bid protest cases should be taken simply to flush out the rationale for an agency's decision").

The Federal Circuit itself does not appear to have fleshed out what constitutes evidence or additional documentation necessary for "meaningful judicial review." *Impresa Construzioni*, 238 F.3d at 1337–38. Some broad and relatively uncontroversial general parameters may be inferred, however, from this Court's past decisions.

On the one hand, "this Court has precluded supplementation of the administrative record with declarations that contain 'post-hoc contentions of fact and argument.'" *PTC, Inc. v. United States*, 143 Fed. Cl. 770, 780–81 (2019) (quoting *L-3 Commc'ns EOTech, Inc v. United States*, 87 Fed. Cl. 656, 672 (2009)). On the other hand, while "[t]he Court has a responsibility to ensure that a bid protest proceeding is not converted into a *de novo* review . . . this requirement must be balanced against the obligation to ensure that the position of both parties is fully understood" not by supplanting the information in the existing record or by "introduc[ing] facts outside the administrative record" but "to take a deeper dive into information that is already in the administrative record." *FirstLine Transportation Sec., Inc. v. United States*, 116 Fed. Cl. 324, 326–27 (2014) (permitting expert declaration "not [to] substitute [his] judgment for the agency's judgment" but where the testimony contained "calculations based on data already contained in the administrative record, so that the Court can better understand the record"). This tension illustrates why "applying the guidance from *Axiom* turns on the facts of each individual case." *Id.* at 327 (distinguishing *Al Ghanim Combined Grp. v. United States,* 56 Fed. Cl. 502 (2003), as a case in which "the Court rejected the protester's attempt to supplement the record with . . . expert declarations . . . because the argument boiled down to a matter of contract interpretation, which is outside the scope of proper supplementation," while "the present case is sufficiently complex such that the Court needs the expert assistance . . . to evaluate Plaintiff's arguments and the issue of prejudice").

---

arbitrary and capricious." *Impresa Construzioni*, 238 F.3d at 1337–38 ("The litigant challenging that presumption necessarily bears a heavy burden.").

With these principles in mind, the Court turns to Superior's pending motion to supplement the administrative record.

### B. Superior Fails to Demonstrate Supplementation is Proper

Superior seeks to supplement the administrative record with "document[s] providing historical data regarding the tonnage of waste disposed at Fort Riley for Fiscal Year 2022 and 2023." Pl. MJAR at 37; *see* Pl. Supp. at 11-13. Though the record already contained such data for fiscal years 2016-2021, Superior asserts that information from the additional years it seeks to include in the administrative record "demonstrates that the tonnage disposed of on Fort Riley has [decreased] by approximately 50% from Fiscal Year 2016 to the present." Pl. MJAR at 37. Superior's argument, construed as favorably as possible, is that its data would bolster Superior's claim that the government must do more to analyze whether Nisou's bid is unduly risky. According to Superior, "CLIN 0001 is a variable cost that goes up or down with the volume of tonnage, whereas CLIN 0004 is a fixed cost," so if Nisou submitted "inflated bids for CLIN 0001 and deflated bids for CLIN 0004," as Superior argues, Nisou's bid could represent a significant risk to the government should waste volume continue to decline as Superior claims it has. *Id.*

### 1. Superior's proffered supplemental information will not aid the Court

Wary of converting a bid protest into a *de novo* proceeding, this Court rejects Superior's argument and denies its motion to supplement the record. *See FirstLine Transportation Sec.*, 116 Fed. Cl. at 326–27. The existing record is not "insufficient to permit meaningful review consistent with the APA," *Axiom*, 564 F.3d at 1381. The record in this case already contains data, compiled and analyzed by the Army, which address Superior's concerns. This Court is ill-positioned to second-guess the Army's analysis of those data. Nor does Superior argue that the data in the record is erroneous — only that the Army should have considered *more* data. Pl. MJAR at 37.

In other words, Superior's proposed addition to the record would not facilitate the Court's taking a "deeper dive" into the government's decisions. *FirstLine Transportation Sec.*, 116 Fed. Cl. at 326. Nor does Superior provide any basis for this Court to conclude that the government was required to consider the specific risk scenario Superior hypothesizes or, in that regard, that the government is required to consider the additional proffered data. In sum, even without the additional information, Superior's claim is "fully understood." *Id*.

### 2. The supplemental information does not meet basic evidentiary standards

Even if this Court were to conclude that there is a basis for supplementation for the type of data Superior proffers, Superior's additional waste data lack a proper

foundation as an evidentiary matter.  The Court is guided on this issue by its precedent in *L-3 Commc'ns Integrated Sys., L.P. v. United States*, which distinguished between the evidentiary standards governing "admission of materials that never were part of the AR of a given procurement in the first place, but instead were either created in the course of the judicial proceedings" and those "documents which the agency omitted from the AR but should have included in the first place or are agency-generated and ought to be included for completeness." 91 Fed. Cl. 347, 358 (2010).  The former materials are fully subject to the Federal Rules of Evidence, while the latter "would not need to conform to the FRE" because they "should have been part of the agency record in the first place." *Id.*

Moreover, regardless of which category the proffered documents falls into in this case — a matter over which the parties would surely dispute — the evidence must "have sufficient reliability or foundation to be admitted to the AR." *L-3*, 91 Fed. Cl. at 362 (holding that a document detailing the duties of the "Principal Deputy Assistant Secretary of the Air Force for Acquisition and her position within the Air Force procurement decision structure" failed this test).

Superior's waste-disposal data fails to meet basic evidentiary standards.  Superior fails to lay a proper foundation for the information by neglecting to include any information about the methodology behind the various charts.  *See* Pl. MJAR at Exh. A.  The Court is left to wonder how the data were compiled, who compiled them, whether there are margins of error, and other questions of basic critical data-analysis.  The Court can hardly rely on a handful of tables with minimal labeling and no explanations of what role this information may or may not have played within the agency's decision-making process.  Finally, the data themselves are hardly reliable, if only due to the missing months in the 2018 and 2023 tables.  Pl. MJAR at Exh. A at 3, 13.  Superior provides no context to understand the total tonnage numbers from those incomplete years.

In sum, the data as presented are facially unreliable and lack the proper laid foundation for the Court to overcome that deficiency.[40]

---

[40] Even if the Court permitted the supplementation, the incomplete 2023 table would render the data virtually useless. Superior's argument about declining waste tonnage rests upon the premise that the total tonnage for 2023 will represent a significant decline from historic levels.  Yet with the calendar year only two-thirds complete as of the time of Superior's supplementation request, Superior simply cannot know, much less prove, that the data support Superior's argument.  *See* Pl. MJAR at Exh. A at 13.

**V.      DISCUSSION: THE COURT DENIES SUPERIOR'S MJAR**

    **A.  Count I – Superior's Challenge to the Government's Unbalanced Pricing Determination and Risk Analysis**

        Superior fires scattershot arguments in contending that the government erred in its unbalanced-pricing analysis, and therefore violated the FAR and the terms of the IFB.

        First, Superior asserts that "the Agency performed a mathematically flawed analysis." Pl. MJAR at 14.  The specific critique is that "the Agency erred in calculating the deviation between [Superior's] CLINs and the IGE CLINs by inverting the numerator and denominator." *Id.* at 16.  Because the "math used by the Agency to perform the analysis is <u>flat out wrong</u>," Superiors contends that "means the Agency **did not perform** the required IFB analysis, which constitutes reversible procurement error." *Id.* (emphasis in original).  Superior requests that this Court "require the Agency to perform the correct calculations and make any subsequent source selection determinations on the basis of the correct math." *Id.* at 18.

        Second, Superior maintains that "[t]he IFB mandates that bids deviating from the IGE by <u>more than 20%</u> indicates that a bid is unbalanced." Pl. MJAR at 19 (citing IFB § 1.3.1.3.2).  Superior further asserts that "the IFB set an acceptable risk for the government based on CLINs deviating from the IGE by no more than 20%." *Id.* at 21. Superior then observes that comparing Nisou's bid "against the IGE show unit price differences far exceeding the 20% threshold established by the IFB[.]" *Id.* at 19.  In a similar vein, Superior notes that Nisou "ha[s] CLINs with more than 20% variance from the IGE *and from other bidders*." *Id.* at 20 (emphasis added); *see also id.* at 22 (arguing that "under the standard set forth in the IFB," Nisou's bid is unbalanced because it varies more than 20% "under both the CLIN-to-IGE and CLIN-to-CLIN analyses").

        Third, Superior complains the Agency improperly "added all CLINs and looked at the bidder's total bid price in comparison to the IGE." Pl. MJAR at 22.  Superior argues that "[t]his total price comparison is not authorized by the IFB," *id.*, and, indeed, that the administrative record "does not include any evidence of a proper risk analysis associated with Nisou['s] . . . <u>unbalanced bid[]</u> under the methodologies for analysis authorized by the IFB." *Id.* at 23.

        Fourth, although the contracting officer determined that Nisou's bid was "materially balanced," AR 2360, Superior asserts that "[t]here is no evidence in the record to support this erroneous conclusion," Pl. MJAR at 15.  According to Superior, the government "elsewhere in the record . . . specifically acknowledges that Nisou's bid was <u>not</u> balanced under the terms of the IFB." *Id.* at 16 (citing AR 2345).  Superior asserts the "Agency cannot have it both ways." *Id.*  Relatedly, Superior asserts that "the Agency

simply did not analyze or document any conclusions regarding whether Nisou's . . . unbalanced bid[] present an unacceptable level of risk to the government." *Id.* at 26.

Before addressing Superior's arguments, the Court first summarizes the FAR and IFB provisions that govern this procurement and Superior's claims here.

### 1. Relevant FAR and IFB provisions

As this is a sealed bid procurement, AR 73, FAR part 14 governs it.[41]  FAR 14.408-2 provides that "[t]he contracting officer shall determine . . . the prices offered are reasonable before awarding the contract."  FAR 14.408-2(a).  That FAR provision does not constrain the contracting officer in determining reasonability, but rather advises only that "[t]he price analysis techniques in [FAR] 15.404-1(b) *may* be used *as guidelines*."  *Id.* (emphasis added) (providing further that "[i]n each case the determination shall be made in the light of all prevailing circumstances").  On the other hand, FAR 14.408-2(b) mandates that "[t]he price analysis *shall* consider whether bids are materially unbalanced," and expressly references FAR 15.404-1(g).  FAR 14.408-2(b) (emphasis added); *see also* FAR 15.404-1(g)(2) ("All offers with separately priced line items or subline items *shall* be analyzed to determine if the prices are unbalanced." (emphasis added)).

FAR 15.404-1(g), in turn, provides that "[u]nbalanced pricing exists when, despite an acceptable total evaluated price, the price of *one* or more line items is significantly over or understated as indicated by the application of cost or price analysis techniques."  FAR 15.404-1(g)(1) (emphasis added).  Regarding whether a bid suffers from unbalanced pricing, the FAR clearly teaches a few things.  First, even if a bid's total evaluated price is acceptable, a finding of unbalanced pricing is still possible.  Second, a finding of unbalanced pricing may be based on just a single CLIN that is "significantly over or understated."  Third, a contracting officer must apply cost- or price-analysis[42] techniques to determine whether a bid is unbalanced.

---

[41] FAR part 14 "prescribes (a) the basic requirements of contracting for supplies and services (including construction) by sealed bidding, (b) the information to be included in the solicitation (invitation for bids), (c) procedures concerning the submission of bids, (d) requirements for opening and evaluating bids and awarding contracts, and (e) procedures for two-step sealed bidding."  FAR 14.000 ("Scope of part").

[42] Price analysis "is the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit."  FAR 15.404-1(b)(1).  In general, the purpose of price analysis — among the other "proposal analysis techniques" FAR 15.404-1 describes — is "to ensure that *the final price* is fair and reasonable."  FAR 15.404-1(a)(1) (emphasis added).  Cost analysis is not relevant in this case, nor required by FAR 14.408-2(b), so we address only price analysis here.

FAR 15.404-1 does not address many of the potential constraints on contracting officer discretion.  To name just a few, the FAR does not: (1) explain precisely how a contracting officer should go about determining what makes the price of a CLIN "significantly over or understated"; (2) define "significantly"; or (3) identify the benchmark for assessing whether a price is "over or understated" (*i.e.*, to what should a price be compared to discern whether it is "over or understated"?).  One conclusion arising from the lack of specificity is apparent: the discretion the FAR affords to the contracting officer here is broad.

With its few mandates and several open questions, the FAR appears to counsel a flexible approach to price analysis.  This conclusion is bolstered by the FAR's own language, which notes that "[t]he complexity and circumstances of each acquisition should determine the level of detail of the analysis required."  FAR 15.404-1(a)(1).  No single analysis technique is prescribed.  Rather, "[t]he Government may use various price analysis techniques and procedures to ensure a fair and reasonable price."  FAR 15.404-1(b)(2).  The FAR *does* provide, however, a non-exhaustive list of examples of price analysis techniques, including, but not limited to:  (1) a "[c]omparison of proposed prices received in response to the solicitation"; and (2) a "[c]omparison of proposed prices with independent Government cost estimates."  FAR 15.404-1(b)(2)(i)&(v).

The FAR also explains *why* the government is concerned about unbalanced pricing: unbalanced pricing "may [1] increase performance risk and [2] could result in payment of unreasonably high prices."  FAR 15.404-1(g)(1).  If a contracting officer determines via price analysis techniques "that an offer is unbalanced, the contracting officer ***shall***" consider both of those risks "in making the source selection decision."  FAR 15.404-1(g)(2)(i)-(ii) (emphasis added).  The FAR further cautions that "[t]he greatest risks associated with unbalanced pricing" exist where: (i) "[s]tartup work, mobilization first articles, or first article testing are separate line items"; (ii) "[b]ase quantities and option quantities are separate line items"; and (iii) "[t]he evaluated price is the aggregate of estimated quantities to be ordered under separate line items of an indefinite delivery contract."  FAR 15.404-1(g)(1)(i)-(iii).

Finally, the FAR provides that the contracting officer "may" reject an offer if, after completing the mandatory risk assessment of FAR 15.404-1(g)(2)(i)-(ii), he or she "determines that the lack of balance poses an unacceptable risk to the Government."  FAR 15.404-1(g)(3).  Thus, even where a contracting officer determines that a bid suffers from unbalanced pricing, and even where a bid portends some risk from unbalanced pricing, the contracting officer is not required to reject it.  Rather, if the contracting officer determines that a bid reflects unbalanced pricing, the contracting officer must only determine whether such pricing "poses an unacceptable risk."  *Id.*  The criteria for making *that* determination are not specifically defined, though it appears obvious that they would encompass the performance risk and risk of overpayment in FAR 15.404-1(g)(1).

The IFB in this procurement incorporates FAR 14.408-2 by reference and, in many respects, lines up nicely with the FAR provisions summarized *supra*. Like FAR 14.408-2, the IFB provides that "the Contracting Officer *shall* determine that the prices offered are fair and reasonable before awarding the contract." IFB § 1.3.1.1 (emphasis added). Second, consistent with FAR 14.408-2, the IFB instructs that the contracting officer's "price analysis *shall* consider whether bids are materially unbalanced [in accordance with FAR] 15.404-1." IFB § 1.3.1.3 (emphasis added). Third, and just like FAR 15.404-1(g), the IFB provides that a bidder "may" be eliminated from consideration for award "if the Contracting Officer determines that the lack of balance poses an unacceptable risk to the Government." IFB § 1.3.1.3. And, just as in FAR 15.404-1(g), the IFB explains that unbalanced pricing may involve two risks: it "may increase performance risk and could result in payment of unreasonably high prices." IFB § 1.3.1.3.1. The IFB even mirrors FAR 15.404-1(g) in defining "unbalanced pricing." *See id.* ("Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more line items is significantly over or understated as indicated by the application of cost or price analysis techniques.").

But the IFB also contains a few home-brew clauses that raise more questions than they answer. The IFB instructs, for example, that each CLIN price "shall be evaluated among [1] all bids received and [2] against the Government Estimate." IFB § 1.3.1.3.2. As part of its instructions regarding comparing CLIN prices to the corresponding IGEs, the IFB then sets an over and understatement percentage maximum, beyond which a discretionary risk assessment is triggered:

> A bid line item unit price difference of greater than or less than 20% for individual prices when evaluated against the Government Estimate **may** be determined as an unacceptable risk to the Government *unless* evaluation shows that all bidders submitted pricing [that] is relatively equal when compared to the Government Estimate."

*Id.* (emphasis added) (the "20% Differential Provision").

There are at least two possible readings of that provision.

One reading of the 20% Differential Provision is that a CLIN price that departs from the government estimate by more than 20% qualifies as a price that "is significantly over or understated," FAR 15.404-1(g)(1), and thus constitutes unbalanced pricing *per se*, thereby triggering a risk determination. That reading makes sense because it accounts for: (1) the IFB's providing the contracting officer with the associated discretion to make an "unacceptable risk" determination, in line with FAR 15.404-1(g)(3); and (2) the fact that IFB § 1.3.1.3.2 is the second numbered paragraph under IFB § 1.3.1.3, which suggests that this entire section is concerned with unbalanced pricing. This reading assumes that the

risk assessment contemplated in the 20% Differential Provision is the same as that contemplated in the unbalanced pricing FAR provision.

A second plausible reading of the 20% Differential Provision is that it is a standalone price-analysis requirement that provides for a discretionary risk assessment that is independent of the unbalanced pricing analysis. In other words, even if there is no unbalanced pricing, exceeding the 20% threshold would nevertheless require some sort of risk analysis. Supporting this reading is the fact that neither of the first two sentences of IFB § 1.3.1.3.2, quoted *supra,* even mentions unbalanced pricing.[43] This reading would mean that the 20% Differential Provision contemplates an unspecified risk assessment that is different than, or in addition to, the unbalanced-pricing risk analysis.

With those two readings in mind, here are some possible permutations:

| Unbalanced Pricing Finding | CLIN Price Percentage Differential Over or Under 20% | Assessment for "Unacceptable Risk" |
|---|---|---|
| Yes | Yes | Required |
| Yes | No | Required |
| No | Yes | Required |
| No | No | Not Required |

Further confusing the matter, the IFB also provides two "example[s] of unbalanced pricing" via an illustrative chart of hypothetical bids:

| UNBALANCED PRICING EXAMPLE | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Unit Price A | | | Unit Price B | | | Award Total |
| | Bid Price | Comp | CLIN Total | Bid Price | Comp | CLIN Total | |
| Bidder A | $4.50 | -5.46% | $112.50 | $6.97 | -2.11% | $334.56 | $447.06 |
| Bidder B | $5.75 | 20.80% | $143.75 | $8.57 | 20.37% | $411.36 | $555.11 |
| Bidder C | $3.74 | -21.43% | $93.50 | $5.58 | -21.63% | $267.84 | $361.34 |
| Bidder D | $5.15 | 8.19% | $128.75 | $6.64 | -6.74% | $318.72 | $447.47 |
| Bidder E | $5.98 | 25.63% | $149.50 | $5.58 | -21.63% | $267.84 | $417.34 |
| | | | | | | | |
| Gov Estimate | $4.76 | | $119.00 | $7.12 | | $341.76 | $460.76 |

[43] A third possible reading of the 20% Differential Provision is that a CLIN's departure from the government estimate by more than 20% "may" constitute "an unacceptable risk" provided there is *also* a predicate finding of unbalanced pricing. This reading seems less likely to have been intended, however, given that it would arguably render the risk analysis stemming from an unbalanced pricing finding redundant of the risk analysis of the 20% Differential Provision.

*See* IFB § 1.3.1.3.2 (identifying hypothetical Bidder C and Bidder E as having proposed "individual unit pricing [that] is unbalanced and is an unacceptable risk").

According to the IFB, "[hypothetical] Bidder C's submitted pricing is unbalanced as it is artificially low and presents undue risk for performance failure." *Id.* The IFB provides no further explanation of the Bidder C example. Is the problem that Bidder C's *two* CLINs are each more than 20% lower that the government estimate? Does that create a *per se* disqualifying risk of performance failure or is the problem that there are two underpriced CLINs (*i.e.*, as compared to the IGE) *in combination with* a total price that is drastically below the IGE? The Bidder C example is vague at best because we know nothing about the particular CLIN structure (*e.g.*, firm fixed price vs. material unit costs). Moreover, the example may be inconsistent with both the terms of the FAR and the IFB, neither of which requires a finding of undue risk merely because pricing is unbalanced or because a CLIN or two depart(s) from the IGE by more than 20%.

The chart's hypothetical Bidder E makes matters worse. Both of Bidder E's two example CLINs depart from the government estimate by more than 20% but do so in different directions: one CLIN is priced 25.63% higher than the government estimate, while one CLIN is priced 21.63% lower than IGE. The IFB comments that Bidder E's "pricing is unbalanced as it poses an unacceptable risk for the Government." IFB § 1.3.1.3.2. This conclusion makes little sense as a matter of syntax: pricing is not unbalanced *because* it poses an unacceptable risk. Such a formulation puts the cart before the horse. The first step, pursuant to FAR 14.408-2(b), is determining *whether* there is unbalanced pricing. The second step, pursuant to FAR 14.408-2(b), is determining whether any unbalanced pricing poses an unacceptable risk. Moreover, the IFB does not explain what type of risk is presented by Bidder E's pricing scenario: is it "performance risk" or the risk of "pay[ing] of unreasonably high prices"? FAR 15.404-1(g)(1). The Court assumes it is the latter — if only to provide an example that is not redundant, given that Bidder C is plagued by the former — but we cannot be sure.

The IFB's language is no help. In the cases of both Bidder C and Bidder E, the IFB describes the pricing as "unbalanced *and* . . . an unacceptable risk." IFB § 1.3.1.3.2. In so doing, it seems to suggest, contrary to other IFB instructions, that the two terms are synonymous and can be analyzed in one fell swoop based on the given price data. At best, it obscures the open question of whether those two concepts are meant to be treated as synonyms or whether there are additional factors that determined — on either a mandatory or permissive basis in this hypothetical scenario — that the bids were both unbalanced and unacceptably risky.

Finally, there is another, more significant ambiguity with the example chart. Fictional Bidder B has two CLINs that exceed the government estimate by more than 20%, but the IFB does not describe Bidder B as having proposed unbalanced pricing at all. This

strongly suggests that the IFB does not provide a *per se* 20% differential maximum, beyond which a determination of unbalanced pricing is mandated.

With these provisions (and their myriad potential constructions) in mind, the Court next addresses Superior's specific arguments.

### 2. Superior fails to demonstrate that any calculation errors were prejudicial

Even assuming the Army performed the incorrect math in calculating the CLIN-to-IGE comparisons, the administrative record demonstrates that Superior's preferred methodology is actually *good* for Nisou and *bad* for Superior.  ECF No. 16 at 4.

Under the Superior's preferred methodology, Nisou had only a single CLIN where the percentage departure from the IGE increased:  Nisou's CLIN 0001 went from 15.95% to 18.97% of the IGE.  All the other CLINs improved, two substantially: CLIN 0002 went from -1.11% to -1.10% (corrected) of the IGE; CLIN 0004 went from -285.17% to -74.04% (corrected) of the IGE; and CLIN 0005 went from -106.19% to -51.50% (corrected) of the IGE.  ECF No. 16 at 4; *see also* Pl. MJAR at 17 (chart described as depicting "wild differences between the correct percentage and the government's result").  Across all option years, just five (5) CLINs for Nisou worsened (in terms of percentage differential from the IGE), utilizing Superior's preferred methodology, ECF No. 16 at Exh. A at 4, which this Court assumes is correct given the parties' stipulation.[44]

In contrast, Superior's preferred methodology for the CLIN-to-IGE comparisons does Superior no favors.  Across all option years, the recalculations show that 10 of Superior's CLINs had *wider* percentage spreads from the IGE than in the government's original calculation.  In the base year, for example, the negative change — that is, the increase in variance from the IGE — is dramatic:  Superior's CLIN 0002 goes from 63.14% to **171.33%** (corrected) of the IGE, and CLIN 0004 goes from 44.45% to **80.03%** (corrected) of the IGE.  *See* ECF No. 16 at Exh. A at 4.

Superior simply cannot prove prejudice on this record with respect to the alleged mathematical error.  The Court agrees with the government that "most of the recalculations strengthen the Army's conclusion that Nisou's bid was materially balanced" while "[Superior]'s pricing, on the other hand, would be dramatically (and negatively) impacted by the recalculation it proposes."  Def. MJAR at 16; *see also* Tr. 22:13-16 (Superior's counsel of record agreeing that Nisou's "percentages go down as a departure from the IGE" under Superior's preferred calculation).

---

[44] Though the government "does not concede that the bidder-to-bidder comparisons in the administrative record contain a miscalculation," ECF No. 16 at 1-2 (referring to updated data as "recalculated"), it stipulates that the CLIN-to-IGE comparisons have been "corrected."  *Id*.

Superior asserts that "[h]ad the Agency applied the proper criteria, it would have recognized that Nisou['s] . . . bid[] [is] materially and fatally unbalanced."  Pl. MJAR at 18.  But if the government did not find Nisou unbalanced under the original calculation, the record demonstrates conclusively that the new calculations Superior prefers will not change the government's conclusion.  And to the extent Superior's own CLIN-to-IGE comparisons get materially worse with the new calculation, Superior is merely throwing stones in a glass house.  *Cf. VS2, LLC v. United States*, 155 Fed. Cl. 738, 768 (2021) ("The simple fact is that VS2 cannot now complain about . . . the government's interpretation of the Solicitation when VS2 relied upon the very same interpretation when preparing its proposal.").  Superior makes little to no effort — and certainly provides no persuasive explanation — for how the new math might change the contracting officer's unbalanced-pricing analysis or even create any doubt about the ultimate contract award decision at issue.  Indeed, Superior concedes that its own bid remains unbalanced, even using Superior's preferred math, Tr. 21:15-25, and, if anything, gets worse, Tr. 46:21-25.  This is the very definition of harmless error.  *IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 401 (2021) ("Of course, if correcting the error would decrease [plaintiff's] chance of award, it cannot establish prejudice."); *Prohibition Juice Co. v. United States Food & Drug Admin.*, 45 F.4th 8, 25 (D.C. Cir. 2022) (assuming that agency erred but finding that plaintiff failed to meet its burden to show prejudicial error).

Superior argues, however, that the Army's failure "to properly apply the formula and/or calculation required by the RFP to compare bidder CLIN[s] to the IGE . . . *in and of itself* constitutes prejudice to [Superior]."  Pl. Resp. at 13 (emphasis added).  Superior thus asserts that this Court cannot "correct calculation errors made by the agency," *id.* at 14, and "cannot accept *post hoc* Agency pricing analysis or calculations that were not conducted at the time the agency actually evaluated proposals," *id.* at 15.  According to Superior, the Army's errors cannot "be disregarded and wiped away by the Court as such decision falls solely into the hands of the Contracting Officer."  *Id.* at 13.

The Court understands Superior to be making two arguments: (1) this Court should presume prejudice or find prejudice *per se* given the nature of the math error;[45] and (2) this Court cannot engage in fact finding, even based on the administrative record, to conclude that any calculation errors are harmless, but rather is required to send this procurement back to the contracting officer to redo the math and the unbalanced-pricing analysis (and any associated risk analysis).[46]

Plaintiff does not expressly invoke *CACI*, and for the reasons articulated above, the Court finds the decision inapposite in any event.  This Court need not order a remand

---

[45] *See* Tr. 22:18-19 ("[W]e believe that [is] per se error . . . not using your own formula the right way[.]").

[46] *See* Tr. 25:21-24 (Superior's "argument is the contracting officer in the agency is the party to run those correct numbers").

for the Court to address putative math errors where, as here, this Court is able to determine *from the administrative record* and "[s]imple algebra"[47] that any such errors did not harm Superior. This is because, as explained above, the Federal Circuit consistently has instructed that "[a] bid protest has two steps." *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021). "First, the trial court determines whether the government acted irrationally or contrary to law in evaluating the proposals and awarding the contract. Second, if the government erred, the trial court then determines whether that error prejudiced the protester." *Id.* (citing *Bannum*, 404 F.3d at 1351). The burden to demonstrate prejudicial error — when applying the APA standard of review — lies squarely on the plaintiff; this is an ironclad rule, as the Supreme Court and the Federal Circuit have made clear. *See, e.g., Shinseki*, 556 U.S. at 409 ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *DynCorp*, 10 F.4th at 1308 n.6 (citing *Carstens v. Nuclear Regul. Comm'n*, 742 F.2d 1546, 1558 (D.C. Cir. 1984), for the proposition that the "onus is squarely upon" a party alleging error under the APA "to establish prejudice").[48]

Here, Superior has failed to carry its burden to demonstrate prejudicial error and, in the alternative, this Court finds that, as a factual matter, any math errors here were harmless. *Prohibition Juice*, 45 F.4th at 25 ("Where a petitioner had ample opportunity yet failed to show that an agency error harmed it, vacatur and remand to give the agency an opportunity to fix the error is unwarranted."); *Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010), *as amended on reh'g in part* (May 12, 2010) ("[H]armless error . . . is applicable to judicial review of administrative decisions and is thus an exception to the *Chenery* doctrine."). To the extent Count I depends on the Army's alleged math errors, this Court rejects it for lack of prejudice. *N. L. R. B. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (holding that "*Chenery* does not require that we convert judicial review of agency action into a ping-pong game" and that a remand is not required where "[i]t would be meaningless to remand"); *Li Hua Yuan v. Att'y Gen.*, 642 F.3d 420, 427 (3d Cir. 2011) ("[W]e will view an error as harmless and not necessitating a remand . . . when it is highly probable that the error did not affect the outcome of the case."). Whether this constitutes a failure to demonstrate an injury-in-fact for Article III purposes, RCFC 12(b)(1), or a failure to prove prejudice on the merits, the result is that Superior does not prevail on this argument.

### 3. Superior cannot rely on its reading of the IFB's 20% Differential Provision

Superior alleges that "the Agency ignored the IFB's mandate that bids deviating from the IFB[s' IGEs] by more than 20% indicated that the bids were unbalanced."

---

[47] *Consol. Safety Servs., Inc. v. United States*, 167 Fed. Cl. 543, 550 (2023).

[48] Superior's counsel agreed with this Court that Superior "ha[s] to show that there's a substantial chance that but for the error, that the result would have been different." Tr. 28:5-8.

Compl. ¶ 50; *see also* Pl. MJAR at 19.   Given the patent ambiguities present in IFB § 1.3.1.3.2, Superior's argument fails.   Superior is simply wrong in asserting that the government mishandled the 20% variance provision in that section of the IFB.   As explained *supra*, there are multiple ways to read that provision, and the plain reading simply does *not* mandate that either the government or this Court conclude that a CLIN-to-IGE deviation in excess of 20% *requires* either a finding of unbalanced pricing *or* the existence of unacceptable risk.[49]

Where, as here, "a Solicitation is patently ambiguous, the government remains free to select a reasonable interpretation, as it sees fit, during the evaluation and award segments of the procurement process."   *Aero Spray*, 156 Fed. Cl. at 576 (citing cases).   Just as in *Aero Spray*, here "the Agency effectively adopted an interpretation that [Plaintiff] does not prefer, but it is too late to complain about that now."   *Id.* at 576-77 (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007) (holding that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so *prior to the close of the bidding process* waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims" (emphasis added))).

According to Superior, Nisou's bid is similar to those of hypothetical Bidders C and E in the example chart, IFB § 1.3.1.3.2, Pl. MJAR at 21, but that chart is also ambiguous, as explained above.   Particularly when considered in conjunction with the applicable FAR provisions, this Court cannot conclude that Superior's preferred interpretation is any more persuasive than the one the government chose in its bid evaluation process.

Superior is also wrong to assert that IFB § 1.3.1.3.2 set a 20% variance benchmark as part of a required CLIN-to-CLIN comparison across bidders.   Compl. ¶ 56. Under any reading of the IFB, the 20% Differential Provision only required a CLIN-to-IGE comparison.   That *is* evident in the plain text of IFB § 1.3.1.3.2.   Thus, to the extent Superior complains that Nisou's CLIN pricing varies more than 20% from other bidders' CLIN pricing, that statistic is not relevant pursuant to the terms of the IFB.[50]   Assuming for the sake of argument that the government made math errors in the CLIN-to-CLIN

---

[49] *See* Tr. 69:25 – 70:15 (Superior's agreeing with the Court's reading of the IFB); Tr. 71:12-19 ("THE COURT: . . . [If] there's a CLIN that is more than 20 percent, that can be used to determine that there's an unacceptable risk.   But it doesn't show that they're unbalanced.   [SUPERIOR'S COUNSEL:] Agreed.   I agree with that.").

[50] If anything, the most reasonable reading of the requirement for a CLIN-to-CLIN price comparison (*i.e.*, across bidders) is to determine whether "bidders submitted pricing [that] is relatively equal when compared to the Government Estimate."   IFB § 1.3.1.3.2.   If that condition is satisfied, then there is no requirement at all to consider whether a specific CLIN's departure from the IGE by more than 20% constitutes an unacceptable risk.   *Id.*

comparison across bidders, Superior never explains how such errors injured Superior or how correcting them would benefit Superior. Yet again, whether this constitutes a failure to demonstrate an injury-in-fact for Article III purposes or a failure to prove prejudice on the merits, the result is that Superior's argument is rejected.

Finally, Superior claims that "the IFB set an acceptable risk for the government based on CLNs deviating from the IGE by no more than 20%." Compl. ¶ 56; *see also* Pl. MJAR at 21 (arguing that "the IFB set an acceptable risk for the government based on CLNs deviated from the IGE by no more than 20%"). That is false. Rather, all the IFB provides, at least by its express terms, is that a CLIN that deviates from the IGE by more than 20% "*may* be determined . . . an unacceptable risk." IFB § 1.3.1.3.2 (emphasis added). And even if the court were persuaded to read the IFB so unnaturally, Superior is still in a glass house. While Superior suggests that even a single CLIN's deviation from the IGE of more than 20% constitutes an unacceptable risk *per se*, Compl. ¶ 56, Superior has more CLINs that exceed that threshold than Nisou and, thus, disqualifies itself by the standards it tries to set for others. Superior cannot demonstrate prejudice.

### 4. The Court rejects Superior's argument based on the government's total price comparisons

Superior is correct that the government compared the bidders' total prices to the IGE. AR 2345 (Chart A); AR 2346 (Chart B). But it is incorrect that this comparison was "not authorized" and "created . . . in order to support the desired award [to] Nisou." Pl. MJAR at 27. While the IFB may not have specifically authorized such a comparison, it didn't prohibit such a comparison either. Contrary to Superior's suggestion, such a comparison has only been "rejected by this Court," *id.* (citing *Al Ghanim*, 56 Fed. Cl. at 516), where "the record contains no indication that the [Agency] engaged in any cost analysis, as required by FAR § 15.404–1(a)(1)." *Al Ghanim*, 56 Fed. Cl. at 514. Where, as here, the agency has engaged in other analyses, there is arguably good reason for the government to have done this comparison: while it cannot tell us much, if anything, about unbalanced pricing, the contracting officer was still required to determine whether "the prices offered are fair and reasonable." *See* IFB §§ 1.3.1.1 (incorporating FAR 14.408-2); 1.3.1.3 (incorporating FAR 15.404-1(b)). Comparing the bidders' total prices seems like one tool in the arsenal for making that determination and for evaluating risk in general. The contracting officer certainly did not violate the IFB by performing this comparison.

There is no basis in the FAR, either, for concluding that the contracting officer was somehow prohibited from performing the total price comparison. In that regard, the Federal Circuit has held that "FAR 15.404-1(b)(3) does not conditionally prohibit a contracting officer from using any particular price-analysis technique." *DynCorp Int'l*, 10 F.4th at 1310. "Rather, FAR 15.404-1 leaves the choice of price-analysis technique to a contracting officer's reasonable judgment in the context of an individual procurement." *Id.*; *see also id.* at 1312 ("The yardstick by which sufficiency is measured here is not some

specific rule, formula, calculation, or detailed fact-finding. Rather, it is the reasonable-discretion-informed appropriateness of the technique under the circumstances.").

In short, the contracting officer's consideration of a metric not specified in the IFB does not render the government's price analysis —either generally or for unbalanced pricing — arbitrary, capricious, or otherwise contrary to law.  And, in any event, Superior conceded at oral argument that the IFB is "ambiguous" about whether it required "comparing whether the CLINs are equal compared to the IGE CLIN . . . or you could potentially be comparing total bids to the IGE . . . [The IFB] doesn't say which."  Tr. 8:15-21.  This means the government gets to select its preferred interpretation.  *Aero Spray*, 156 Fed. Cl. at 576-77 (citing *Blue & Gold*, 492 F.3d at 1315); *see also* Tr. 9:1-6.

> **5. Although the Army's unbalanced-pricing analysis is inconsistent with the FAR and its resulting findings are unsupported by the administrative record, any errors or omissions are harmless as Superior does not challenge the Army's overall risk analysis**

The Court begins its assessment of Superior's more general allegations against the government's unbalanced-pricing analysis with the Independent Price Analysis Report ("IPAR"), AR 2342-50; the IPAR contains the government's underlying unbalanced-pricing analysis upon which the contracting officer relied in this procurement.  *See* AR 2354 ("I agree with the conclusions of the procurement analyst[.]").

According to the IPAR, "[t]he concern is whether or not there is unbalanced pricing amongst the offerors['] bid and the IGE, and whether there is an increased risk to the government if an offer were to be selected for award."  AR 2347.  The unbalanced-pricing inquiry's setup is thus consistent with the relevant FAR and IFB provisions.

But then the IPAR goes sideways.  It concludes that "[i]n answering the first question," regarding the existence of unbalanced pricing, "there is only one offeror that fits the definition of 'unbalanced pricing' as stated by the . . . GAO's decision in First Financial Associates, Inc., B-415713, B-415713.2 (Feb. 16, 2018)[.]"  AR 2347.  The IPAR summarizes the GAO framework as follows:

> "In the competitive world of government contracts, it's not unusual for competitors to question one another's pricing, and 'unbalanced pricing' is one of those terms that is often thrown around when a competitor's pricing appears suspect. But as the First Financial Associates protest demonstrates, a proposal containing understated CLINs alone isn't unbalanced — rather, *unbalanced pricing requires both understated and overstated line items*."

AR 2347 (emphasis added).  The IPAR does not indicate what it's quoting, but that is *not* a quote from our GAO decision.  Rather, a Google search reveals it is a quote from a government contracts blog, *see* Steven Koprince, *GAO: Understated Pricing Alone Isn't "Unbalanced Pricing"* (March 2, 2018), https://smallgovcon.com/gaobidprotests/gao-understated-pricing-alone-isnt-unbalanced-pricing/.

Here is how the actual GAO decision frames the unbalanced-pricing analysis:

> Unbalanced pricing exists where the prices of one or more line items are significantly ***overstated or understated***, despite an acceptable total evaluated price (typically achieved through underpricing of one or more other line items).  To prevail on an allegation of unbalanced pricing, ***a protester must show that one or more prices in the allegedly unbalanced proposal are overstated***; it is insufficient for a protester to show simply that some line item prices in the proposal are understated.  While both understated and overstated prices are relevant to the question of whether unbalanced pricing exists, *the primary risk to be assessed in an unbalanced pricing context is the risk posed by overstatement of prices*, because low prices (even below cost prices) are not improper and do not themselves establish (or create the risk inherent in) unbalanced pricing.

*First Fin. Assocs., Inc.*, B-415713, 2018 CPD ¶ 76, 2018 WL 1083105, *5 (Comp. Gen. Feb. 16, 2018) (emphasis added) (internal citations omitted).

In any event, whether the Army used the framework described in the blog post or the GAO decision itself, the Army erred insofar as both formulations are inconsistent with the plain language of FAR 15.404-1(g), which provides that "[u]nbalanced pricing exists when . . . the price of *__one__* or more line items is significantly over *or* understated." FAR 15.404-1(g)(1) (emphasis added).  Contrary to the FAR, the blog post summary asserts that unbalanced pricing exists only where there is "both understated and overstated" CLIN prices.  AR 2347.  In contrast, the first line of the above-quoted excerpt from the GAO's decision in *First Financial* is consistent with the plain language of FAR 15.404-1(g)(1).  But the rest of the GAO's language finds no support in the text of the applicable FAR provision.  In particular, *First Financial* is wrong that unbalanced pricing cannot exist based on a single understated price.  And while *First Financial* asserts that the primary risk to be assessed "is the risk posed by overstatement of prices," *First Fin. Assocs., Inc.*, 2018 WL 1083105, *5, the FAR explicitly instructs that a contracting officer must consider not only the risk of "unreasonably high prices" but also "increased performance risk."  FAR 15.404-1(g)(1); *see also* FAR 15.404-1(g)(2)-(3) (implicitly distinguishing between the risk of "paying unreasonably high prices" and other "unacceptable risk[s]" that may come from high or low prices).

Tracing the GAO's decisional history backwards from *First Financial*, the error in the GAO's formulation appears to have germinated in *Ken Leahy Constr., Inc.*, in which the GAO wrote this: "Unbalanced pricing exists where the price of one or more contract line items is *significantly overstated*, despite an acceptable total evaluated price (typically achieved through underpricing of one or more other line items)." B-290186, 2002 CPD ¶ 93, 2002 WL 1276395, *2 (Comp. Gen. June 10, 2002) (emphasis added) (citing FAR 15.404-1(g)(1)). A few years later, in *Academy Facilities Management--Advisory Opinion*, the GAO followed that logic to conclude that "[a]s there is no evidence of overstated prices, we see no basis to conclude that the . . . offer was unbalanced." B- 401094.3, 2009 CPD ¶ 139, 2009 WL 2217662, *12 (Comp. Gen.  May 21, 2009) (citing *USATREX Int'l, Inc.*, B-275592, 98-1 CPD ¶ 99, 1997 WL 868302 (Comp. Gen. Mar. 6, 1997)).  But as already pointed out, these contain inaccurate statements of law. The FAR provides that unbalanced pricing may arise from even a single line item being "significantly over or understated." FAR 15.404-1(g)(1). Moreover, *USATREX* — upon which *Academy Facilities* relied — was premised on a since-replaced FAR provision that distinguished between now-defunct concepts of "mathematical" and "material" unbalancing. *USATREX*, 1997 WL 868302, *5 (citing former FAR 15.814 for the proposition that "an offer can be rejected as materially unbalanced only where it is found to be mathematically unbalanced" and explaining that "this requires a showing that certain line items are priced significantly lower than the cost of those items, and that other line item prices are significantly overstated").

The disconnect between the regulatory mandate and its treatment in GAO decisions is not new.  Others, including at least one commentary from decades ago, have identified the same problem:

> The new rule on unbalanced pricing in revised FAR 15.404-1(g) bears very little resemblance to its FAR 15.814 predecessor and to GAO doctrine.  First, the [new] rule does not mention mathematical unbalancing.  Instead, the sole focus is on whether the price of one or more contract line items is significantly overstated or understated; both need not be present. This regulation effectively overrules [older GAO] cases . . . , which required allegations on both scores.

S. Feldman, *Unbalanced Bids and Proposals: Simplification or Confusion?*, 13 No. 6 Nash & Cibinic Rep. ¶ 30 (June 1999); *see also* S. Feldman, 2 *Government Contract Awards: Negotiation and Sealed Bidding*, § 11:22 (Oct. 2023 update) ("The GAO has incorrectly stated that unbalanced pricing exists when the price of one or more contract line items is significantly overstated, despite an acceptable total evaluated price. . . . As stated in FAR 15.404-1(g)(1), however, unbalanced pricing can exist when one or more contract line items is significantly overstated or understated."); *id.* (explaining that GAO decisions "sometimes say erroneously that the potential risk associated with unbalanced pricing

arises from those line items with overstated prices, not from underpriced ones. For unknown reasons GAO continues not to enforce FAR 15.404-1(g)(1) . . . .”).  These observations underscore one apparent source of confusion, which is that the term “unbalanced” implies a combination of overstated and understated prices that presents risks despite a reasonable total price.  Though the term once bore that plain meaning, its meaning as used in the current FAR is no longer so limited.  The GAO, and by extension the IPAR, has mistakenly revived an outdated test for unbalanced pricing.

Nor is the undersigned the first judge of this Court to critique the GAO’s persistent use of an erroneous, outdated formulation.  *Green Tech. Grp., LLC v. United States*, 149 Fed. Cl. 236, 243 (2020) (Hertling, J.) (concluding that “the GAO’s decisions tend to render FAR 15.404-1(g)(2)(i) surplusage by addressing only the risk of paying unreasonably high prices”); *Green Tech. Grp., LLC v. United States*, 147 Fed. Cl. 231, 240 (2020) (“Both prongs of the FAR 15.404-1(g)(2) test are equally important. In addition to price risk, agencies must assess the performance risk of proposals with unbalanced pricing.  FAR 15.404-1(g)(2)(i).   To assess performance risk, an agency must assess the offeror's ‘expertise and apparent understanding of the contract, both of which are undermined by unbalanced pricing.’” (quoting *Harmonia Holdings Grp., LLC v. United States*, 136 Fed. Cl. 298, 309-10 (2018))).[51]

The IPAR’s erroneous foundation, which draws upon on an incorrect GAO formulation to apply an incorrect standard in a required analysis, leads this Court to find that the Army’s deeming Nisou’s pricing “materially balanced” is arbitrary, capricious, and otherwise contrary to law.  *In re Vivint, Inc.*, 14 F.4th 1342, 1351 (Fed. Cir. 2021) (holding that an APA violation occurs if agency action “is based on an erroneous conclusion of law” (quoting *Honeywell Int’l Inc. v. Arkema Inc.*, 939 F.3d 1345, 1348 (Fed. Cir. 2019))).

But that is not the end of the trouble for the Army’s analysis.

The IPAR identified, as noted *supra*, only one bidder with unbalanced pricing, even though the agency also found that “[e]very offer, competing for this contract, has both overstated and understated line items.”  AR 2347.  But the IPAR does not indicate whether the Army ever considered whether the prices for those referenced line items were “*significantly* over or understated,” FAR 15.4041-1(g)(1) (emphasis added)  — whether based on a price analysis comparing each CLIN price to the corresponding IGE or based on some other comparison.  That is the first step of the unbalanced-pricing

---

[51] *Cf. Ekagra Partners, LLC v. United States*, 163 Fed. Cl. 189, 215 (2022) (noting that “both understated and overstated prices are relevant to the question of whether unbalanced pricing exists” but that “the primary risk to be assessed in an unbalanced pricing context is the risk posed by overstated prices” (quoting *AECOM Mgmt. Servs., Inc.*, B-417506.12, 2019 CPD ¶ 342, 2019 WL 5207000, at *19 (Comp. Gen. Sept. 18, 2019))).

analysis, and yet the administrative record does not support that such an assessment was ever completed. That's not to say the agency didn't do the mathematical comparison — it most certainly *did*, *see* AR 2353-59 — but there is no evidence of an assessment of what the percentage calculations mean.

The IPAR *did* extensively examine bidders' CLINs over time — presumably to capture unbalanced pricing in the base year as compared to option years — in finding that one bidder suffered from unbalanced pricing. AR 2349 (noting that this bidder had "extremes in their line item pricing from year to year in all CLINS except for CLIN three[]" and that "this type of pricing structure could place a higher risk on the Government in underpaying for some services and overpay[ing] for other services"). But while one of the "greatest risks associated with unbalanced pricing occur when . . . [b]ase quantities and option quantities are separate line items," FAR 15.404-1(g)(1)(ii), the required risk assessment is the second step. The first step is determining *whether* there is unbalanced pricing to begin with. Moreover, unbalanced pricing may create risk not just across base and option years but also within a particular period of performance. Thus, in limiting its unbalanced-pricing analysis to a year-over-year comparison within each bid, the agency's IPAR was irrational and violated FAR 15.4041-1(g). Merely performing the CLIN-to-IGE percentage calculations was insufficient; the agency had to assess whether the CLIN prices were "*significantly* over or understated," FAR 15.4041-1(g)(1).

The IPAR also concluded as follows:

> Each bidder's pricing was compared to the IGE and evaluated using the techniques stated in this document to make a determination as to whether or not the bidders' prices were or were not unbalanced as stated in the Federal Acquisition Regulation. *By comparing each like CLIN throughout the 5-year period of performance, it is evident that three of the 4 bidders showed no evidence that their line item prices posed a significant risk of non-performance due to under or over stating their proposed prices as compared to the IGE.*

AR 2350 (emphasis added).

This paragraph, too, is *far* from clear and, if anything, tends to support Superior's general complaint. On the one hand, there is a conclusory statement that the Army applied the required FAR and IFB analyses —including CLIN-to-IGE comparisons. But then the paragraph appears to explain that the only analysis the agency performed related to the base versus option year comparisons, and not the IGE. And while the IPAR notes, again, that "every bidder's proposal contained pricing, on several claims, that were above or below the 20% variance," AR 2349-50, the IPAR never explains why such pricing

does not constitute pricing that "is significantly over or understated." FAR 15.404-1(g)(1).[52]

There is also a gaping hole in the logic:  the IPAR does not explain *how* comparing "like CLIN[s] throughout the 5-year period of performance" makes "it . . . evident" that "line item prices" did not pose a significant risk for three out of four bidders.  AR 2350. Indeed, the latter does not follow from the former, because risk does not necessarily arise only from year-over-year changes; the IFB, with its repeated insistence on comparing to CLINs to IGEs, confirms the intuitive conclusion that risk arises primarily from price variance between government estimates and contractor bids. Thus, the IPAR's conclusion is totally unexplained.  Moreover, we know that the agency assessed only a single bidder as having unbalanced pricing, but that was based on the year-to-year CLIN comparisons, implying that no further analyses were material.  If there were other analyses of the CLIN-to-IGE percentages, there is no explanation of what they showed.  A naked assertion that something "is evident," without more, is no explanation at all.  The government must, but did not, show its work.  *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663 (4th Cir. 2017) ("[T]he dispute here arises from a problem that has become all too common among administrative decisions challenged in court – a problem decision makers could avoid by following the admonition they have no doubt heard since their grade-school math class: Show your work."); *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 109–10 (2020) ("Meaningful judicial review requires more than just accepting . . . a bald assertion.").

The contracting officer's Source Selection Decision ("SSD"), AR 2352-60, does not seal up the IPAR's leaky logic.  In the SSD, the contracting officer recited many of the salient requirements from IFB § 1.3, but then reached this barebones conclusion:

> I determined that each of the bidders CLINs varied either higher or lower than the 20% when compared to each other's bid prices on multiple CLINs.  While each of the bidders did have this variance, as detailed below, I only found Bidder D [CVICS] to be materially unbalanced because they posed an unacceptable risk to the Government.

AR 2354.  A glaring problem with this statement, as noted *supra*, is that pricing cannot "be materially unbalanced ***because*** [the bidder] pose[s] an unacceptable risk."  *Id.* (emphasis added).  A bid's prices are either balanced or unbalanced (as determined by

---

[52] That is not to say that the 20% threshold *requires* a finding of unbalanced pricing — it does *not* clearly provide that, as explained *supra*.  Rather, a CLIN that departs from the IGE by more than 20% triggers only a risk assessment.  The problem is that even the risk analysis appears incomplete: the above-quoted paragraph only mentions the "risk of non-performance" and not the risk of "paying unreasonably high prices for contract performance," FAR 15.404-1(g)(2)(ii).

applying price analysis techniques); the contracting officer's risk analysis is a separate, subsequent procedure. The SSD conclusion thus makes little sense and suggests that the contracting officer did not understand how to implement FAR 15.404-1(g) to determine whether prices were balanced.

The next several pages of the SSD reveal that the contracting officer's explanation for why only Bidder D (*i.e.*, CVICS) was deemed materially unbalanced revolves around the year-over-year CLIN comparison.[53]   AR 2356-58 (addressing only the bidders' "escalation rates from year to year"), AR 2359 (summarizing charts showing "the dollar amount of difference between each year's prices as well as the percentage of difference (higher or lower) [from] the year before it"). Indeed, the contracting officer makes clear that he only considered "extremes in . . . line-item pricing from year to year," and that was the extent of his analysis to determine whether bids contained unbalanced pricing: "As [a] result of this analysis, all other bidders' prices were not found to be unbalanced as there are no extreme variations in CLIN prices from year to year as verified to in Charts D, F, & G above." AR 2359 (referencing year-to-year CLIN comparisons of each bidder). This conclusory statement based upon, at best, information of secondary importance, is insufficient to pass APA review. *See Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1137–38 (5th Cir. 2021) (rejecting agency's "statement [as] conclusory, unsupported, and thus wholly insufficient"); *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562–63 (D.C. Cir. 2010) ("[W]e do not defer to the agency's conclusory or unsupported suppositions." (alteration in original) (quoting *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004))).

Accordingly, the Court concludes that the contracting officer's determination in the SSD that Nisou's bid was "materially balanced," AR 2360, is arbitrary, capricious, or otherwise contrary to law.

But all of that merely begs the question whether the agency's failure prejudiced Superior. In other words, how did the agency's error affect the contract award decision? At this stage of the dispute, Superior must prove prejudice from the administrative record. *See Shinseki*, 556 U.S. at 408; *Sys. Stud. & Simulation*, 22 F.4th at 998 ("The protestor must show prejudice under the usual standard."); *see also Ahtna Logistics, LLC v. United States*, 163 Fed. Cl. 488, 516 (2022) (noting "the plaintiff's burden" to establish prejudice at the MJAR stage). Assuming for the sake of argument that a correct analysis of Nisou's pricing would lead the contracting officer to conclude that Nisou's pricing is unbalanced, the contracting officer would still *not* be required to eliminate Nisou from the procurement due to "unacceptable risk." *See* FAR 14.408-2; AR 1227, 1731. Although such a finding is discretionary even where the pricing is unbalanced, the contracting officer's risk assessment is mandatory and must be reasonable. In that regard, Superior

---

[53] The contracting officer also followed the erroneous unbalanced-pricing guidance from the GAO's decision in *First Financial*. AR 2356.

argues that "[t]he Agency simply did not analyze or document *any* conclusions regrading whether Nisou's . . . unbalanced bid[] present[s] an unacceptable level of risk to the government."  Pl. MJAR at 26 (emphasis added).

Superior's assertion is demonstrably wrong.  In the penultimate sentences of the SSD — in a section titled "Award Decision — the contracting officer documents his risk determination *as if* he had concluded that Nisou's pricing was unbalanced:

> Nisou's CLIN 4 and CLIN 5 (base year only) were the only CLINs to differ from the IGE more than 20%.  In each case, they were under the IGE.  I made the determination that this did not pose an unacceptable risk to the Government.  First, Nisou assumed the cost risk of being under the IGE since this is a firm fixed price contract.  Second, I did not have concerns about Nisou's ability to perform financially since these are the two least expensive CLINs by a wide margin to the other two CLINs.  Further, after reviewing Nisou's financial aspects in its bid, I do not have concerns about its financial status.

AR 2360.  *Superior entirely ignores this risk assessment in its briefs*.  Superior thus fails to explain why this risk assessment reasoning is either deficient or insufficient or, more importantly, why it would change in Superior's favor even if the contracting officer were to find Nisou's pricing unbalanced on remand.

Just as "the Court will not put words in an agency's mouth or invent supporting rationales the agency has not itself articulated in the administrative record," *IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 286 (2022), so too "the Court will not litigate this matter" for Superior.  *Advanced Powder Sols., Inc. v. United States*, 160 Fed. Cl. 575, 582 (2022), *recons. denied*, 2022 WL 2720193 (Fed. Cl. July 13, 2022).  Because Superior has entirely failed to address the contracting officer's overall risk assessment, Superior fails to demonstrate prejudicial error.  Superior's glaring omission also constitutes waiver and is fatal to Count I.  *Prohibition Juice Co.*, 45 F.4th at 25 (holding that "petitioners have also forfeited any argument that the alleged error prejudiced them").[54]

---

[54] Although Superior does not respond to the risk assessment, Superior does lay out an elaborate theory of how Nisou gamed its pricing to the detriment of the government, Compl. ¶¶ 61-69, Pl. MJAR 23-25.  Superior is not entitled, however, to have its specific (and highly speculative) theory considered by the contracting officer.  The FAR provision governing unbalanced pricing is unlike the FAR's OCI provisions, which *do* provide a would-be contractor an opportunity to submit its view to the contracting officer.  *See CACI*, 67 F.4th at 1154.  Moreover, Superior during oral argument conceded that its claim regarding alleged gamed prices is fundamentally based on the further contention that the government's IGE is flawed.  Tr. 44:15-25.  Superior never alleged or developed *that* claim, however, and it is waived.  Tr. 45:1-5 ("THE COURT: Where is that in your complaint?  [SUPERIOR'S COUNSEL:] Well, that is not an issue we briefed.").

Finally, the Court notes that given that the contracting officer documented his risk assessment in the administrative record and that the government has made no additional arguments to justify the sufficiency of those assessments, this Court is not relying on any *post hoc* rationalization or making a *de novo* determination of how much risk Nisou's and Superior's bids might present. Accordingly, the Court's conclusion that Superior failed to prove prejudice does not run afoul of *CACI* as this Court reads that decision. *See Prohibition Juice Co*, 45 F.4th at 25 ("Where a petitioner had ample opportunity yet failed to show that an agency error harmed it, vacatur and remand to give the agency an opportunity to fix the error is unwarranted.").

Failure to demonstrate prejudice is fatal to Superior's arguments. *See Shinseki*, 556 U.S. at 408; *Sys. Stud. & Simulation*, 22 F.4th at 998 ("The protestor must show prejudice under the usual standard."); *Ahtna*, 163 Fed. Cl. at 516.

### B. Superior Abandoned Its Remaining Arguments or They Are Moot

So much for Count I. Superior still has three sources of complaint with how the government conducted this procurement. As noted above, Superior also maintains it is entitled to judgment because the government failed to reject Nisou's bid because it was not submitted properly, Compl. ¶¶ 70-73 (Count II), improperly found that Nisou was responsible to perform the contract, *id.* ¶¶ 74-79 (Count III), and failed to reject CVICS' bid as late and non-responsive, *id.* ¶¶ 80-98 (Count IV).

With respect to Counts II and III, the court considers Superior's arguments abandoned based on its choice not to pursue *any* counterarguments to the government's cross-MJAR and response brief on these two counts.

Superior's Count II section in its own MJAR is cursory. *See* Pl. MJAR 26-27. Superior argues that the "Agency mishandled the receipt and evaluation of Nisou's bid . . . in violation of the IFB and the requirements of FAR Part 14." *Id.* at 26. Specifically, Superior quotes the IFB and FAR which require that bids be "submitted in sealed envelopes or packages (unless submitted by electronic means)." *Id.* at 27 (quoting FAR 52.214-5). Nisou, according to an agency memo in the administrative record, submitted its bid in "a box with a lid on it . . . placed into [a] secured four[-]drawer cabinet with the other bids." AR 994. Superior argues that because the package was "unsealed" despite containing a lid and being placed in a secured cabinet, Nisou should be disqualified on a strict interpretation of the FAR and the possibility that unsealed bids "undermine[] the integrity of the sealed bidding process and substantially increase[] the perception of potential impropriety." Pl. MJAR at 27.

In its cross-MJAR, the government responded that "the word 'sealed' is not defined in either the FAR or the IFB" and "Nisou's closed package can reasonably be considered sealed." Def. MJAR at 29-30. Based on dictionary definitions of the term

"sealed" and the fact that "[n]o one could observe the box's contents without first removing the secured lid," the government argues that its choice to treat the bid as properly submitted was "reasonable." *Id.* at 30. Moreover, the government points out that notwithstanding Superior's concerns about the integrity of the process and perception of impropriety, there is no way to establish prejudice. *Id.* at 30-31.

At a minimum, the government presents plausible arguments, and Superior had the opportunity to show why they are inapposite or wrong in its response. ECF No. 13. Superior, however, failed to do so. Instead, Superior chose to stand on its opening MJAR, indicating only that Superior "does not waive or rescind any of the remaining errors," presumably meaning *allegations* of remaining errors, "not individually addressed herein." *Id.* at 2.

This boilerplate language cannot save Superior's arguments. As courts have long recognized, "[a] reply brief . . . can waive an argument by failing to respond to the opposing party's *counterarguments* or *new arguments* raised in the response brief." *Kyles v. Beaugard*, 2023 WL 5277882, at *21 (N.D. Ill. Aug. 16, 2023); *see also Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023) ("An appellant may waive a non-jurisdictional issue or argument in many ways, such as by ... failing to respond in a reply brief to a new argument raised by appellee."); *Webb v. Frawley*, 906 F.3d 569, 582 (7th Cir. 2018) ("Yet because Webb did not respond to this point in his reply brief, he waived any counterarguments he could have raised."); *United States v. Johnson*, 732 F. App'x 638, 655 (10th Cir. 2018) ("[appellant] fails to respond to the government's waiver argument in his reply brief. Thus, he has 'waive[d], as a practical matter anyway,' any non-obvious reasons for rejecting it."); *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) ("We have previously held that a plaintiff has abandoned . . . claims by not raising them in opposition to the defendant's motion for summary judgment." (internal quotations and alterations omitted)); *Allen v. Dollar Tree Stores, Inc.*, 475 F. App'x 159, 159 (9th Cir. 2012) (holding that the district court "properly dismissed" two of plaintiff's claims "because [plaintiff]'s opposition to the motion to dismiss failed to respond to [defendant]'s arguments that those claims were time-barred"); *Sportscare of Am., P.C. v. Multiplan, Inc.*, 2011 WL 589955, at *1 (D.N.J. Feb. 10, 2011) ("In most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue."); *Levy-Tatum v. Navient Sols., Inc.*, 183 F. Supp. 4 701, 712 (E.D. Pa. 2016) (finding that plaintiff, "by filing a response in opposition to [defendant]'s motion to dismiss that addressed some, but not all, of [defendant]'s arguments, abandoned those claims upon which [plaintiff] failed to make any substantive arguments, and those claims are therefore waived").

This Court is no exception. "A party's failure to raise an argument in an opening or responsive brief constitutes waiver." *Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 58–59 (2021) (finding that a response brief's "single reference" to prior arguments indicated that plaintiff "all but abandoned" his claim); *see also Cap Exp., LLC v. Zinus, Inc.*,

722 F. App'x 1004, 1009 (Fed. Cir. 2018) (quoting *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F.Supp.2d 1125, 1132 (C.D. Cal. 2011), for the proposition that "in most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue").

More broadly,

> [t]his Court will not permit a party to raise a phalanx of thin arguments in a dispositive motion — thereby forcing the opposing party to spend time and briefing space to engage with all of them — only to abandon them in the face of the counterarguments, and yet insist that the Court adjudicate the entire initial salvo. Such a buckshot-like approach to advocacy undermines both judicial economy and basic notions of fairness.

*Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 695–96 (2022) (citing *Cap Export, LLC v. Zinus, Inc.*, 722 F. App'x 1004, 1009 (Fed. Cir. 2018) (concluding that plaintiff-appellee "abandoned the reference altogether, as [plaintiff-appellee] did not address that reference in its opposition brief before the district court"), and *Sarro*, 152 Fed. Cl. at 58); *see also Newimar S.A. v. United States*, 160 Fed. Cl. 97, 122 (2022) (finding that plaintiff's "response and reply entirely omits any mention of 'taint' in the Revised Solicitation" and therefore plaintiff has "abandoned its arguments regarding tainted amendments in the Revised Solicitation").

Superior thus dropped the ball in arguably two different ways.  At the level of argumentation, it failed to rebut the government's points regarding a reasonable construction of the FAR and IFB requirements.  Even if the Court believed Superior's argument had some merit, Superior hands the government the last word on the matter. That is one dimension of abandonment; it is an implicit concession of the argument on the merits.  The second dimension is the more formal mechanism of waiver.  Just as the plaintiff in *Newimar* failed to mention a key concept undergirding one of its initial arguments, 160 Fed. Cl. at 122, so too does Superior fail to mention the words "unsealed," "sealed," or "box," in its response.  That is just one way to think about Superior's waiving any rebuttal to the government's argument.   In its total failure to respond to the government's arguments it has waived or abandoned Count II.

Count III is little different, so there is no need to rehash the law just recited. Superior initially argued that Nisou's "lack of experience" and "qualified personnel" disqualified them from this contract under FAR 9.104-1, which required the Army to determine whether a potential contractor is capable ("responsible") of fulfilling the

contract duties.  Pl. MJAR at 27-29.  Much of this argument, Superior admits, is "[u]pon information and belief."  *Id.* at 29.

This is an ambitious challenge, one the government correctly notes "faces a high hurdle" to prove.  Def. MJAR at 32 (citing *Supreme Foodservice GmbH v. United States*, 112 Fed. Cl. 402, 415 (2013) and *Bender Shipbuilding & Repair Co., Inc. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002)).  The government offered several counterpoints to Superior's attack on Nisou's capabilities and the Army's discretion to award them the contract. Though Superior had claimed that Nisou's past performance was not like the work called for in the IFB, Pl. MJAR at 28, the government noted that

> Nisou listed eleven past performance references, and the contracting officer considered each one in evaluating Nisou's responsibility. *See* AR 613-20; *see also* AR 1794. The Army assessed one of these past performances as very relevant and two as relevant. AR 930. The very relevant contract is with Nagpur Municipal Corporation where Nisou performed "door to door segregated collection and transportation of solid waste of Nagpur City up to processing site directly and collection point[.]"

Def. MJAR at 33.  To Superior's challenge regarding Nisou's lack of qualified personnel, the government responded by invoking the deference afforded to the contracting officer and his reasonable reliance on Nisou's representations, and Superior's inability to show abuse of discretion in the process.  *Id.* at 34.

These are not necessarily ace responses, and perhaps Superior could have returned the volley — but Superior did not attempt to do so.  As in the case of Count II, Superior did not address *any* of the government's arguments.  Case in point: once again, all the key words are missing from the response.  Nowhere does Superior include "qualified," "unqualified," "personnel," "responsible" (except for page 1, in reference to itself), or "experience."  These absences are glaring, and indicative once again of a waiver.  *See Newimar*, 160 Fed. Cl. at 122.

Finally, Count IV — that the government erred by failing to reject CVICS' bid as late and non-responsive, Compl. ¶¶ 80-98 — is moot.  The government does not contest Superior's standing, and this decision does not rest on Superior's ability to prove that it is an "interested party" in the sense of being next-in-line for the contract.

## VI.   RELIEF

To obtain a permanent injunction, a plaintiff must show that: (1) it has succeeded on the merits; (2) it will suffer irreparable harm if the procurement is not enjoined; (3) if

the procurement action is not enjoined, the harm to plaintiff will outweigh the harm to the government and third parties; and (4) granting injunctive relief serves the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). Because Superior has failed to demonstrate prejudice (or otherwise has waived its claims), Superior fails on the merits of its case, and therefore cannot demonstrate that injunctive relief is warranted here. In the alternative, this Court concludes that even if Superior had succeeded on the merits, injunctive relief is not warranted. *Id.* at 1226 ("We thus hold that, in a bid protest action, section 1491(b)(4) does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award.").

At most, this Court would order a remand to the agency to redo the unbalanced pricing analysis. We would not enjoin or otherwise pause the performance of the awarded contract. *IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57, 85 (2022) (denying vacatur and injunction where "there is a reasonable possibility that the government can justify its decision"); *see also SAGAM Securite Senegal*, 2023 WL 6632915, at *8 (citing *IAP Worldwide*, 160 Fed. Cl. at 82, with approval, and noting that "the [Court of Federal Claims] has the authority to either issue an injunction or remand to the agency, and determining the appropriate course may depend on the facts at hand"); *Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1049 (10th Cir. 2023) (citing *IAP Worldwide*, 160 Fed. Cl. at 85, with approval, for the proposition that "*Regents* does not preclude remand without vacatur as an appropriate remedy under the APA").

The fatal problem for Superior's request for permanent injunctive relief — again, even assuming it had demonstrated a prejudicial error in the procurement at issue — is that Superior does not even attempt to establish a factual predicate for the favorable application of the various injunctive relief factors.

Superior argues that "the failure to enjoin the Contract and direct the Army to take corrective action would cause tremendous, non-recompensable harms to [Superior]." Pl. MJAR at 36. But that critically assumes that the outcome of any new unbalanced pricing decision would result — or would likely result — in a contract award to Superior. This Court concludes, however, that just like the plaintiff in *IAP*, Superior's "putative irreparable harm is 'highly speculative' . . . [and] does not justify highly coercive relief . . . vacating the awarded contract." *IAP Worldwide*, 160 Fed. Cl. at 83 (explaining that a remand without vacatur "can address the harm that [the plaintiff] has suffered without ordering injunctive relief"); *id.* at 90 ("[Plaintiff] has not demonstrated irreparable harm of a sufficient nature to justify vacating the Army's contract award, but . . . has demonstrated sufficient prejudice to support a remand."). The result may well be different in a case where, for example, the plaintiff demonstrates that the putative awardee's pricing presents an unacceptable risk, that a contracting officer should have made such a determination, or where there was no risk assessment performed at all. *See, e.g., IAP*, 152 Fed. Cl. at 408-09 (Meyers, J.) (finding "failure to evaluate proposals for unbalanced pricing was not harmless error"); *Green Tech.*, 147 Fed. Cl. 231 (rejecting

government's harmless-error argument after the agency failed to adequately perform the mandatory risk analysis after finding unbalanced pricing, and enjoining the award based on the failure to perform a mandatory analysis).

Here, Superior makes no attempt to support any of the injunctive relief factors with facts. Instead, it relies on the talismanic invocation of injunctive relief guidelines found in various bid protest decisions. For example, Superior makes no showing of how the loss of the contract at issue will burden its business or employees, or why vacatur is necessary for an effective remand. Superior has not carried its burden to demonstrate its entitlement to the injunctive relief it seeks. Even assuming the government committed a prejudicial error in this procurement, this Court denies Superior's requested injunction.

## VII.   CONCLUSION

Given Superior's failure to demonstrate that the government committed prejudicial error in the challenged procurement, this Court **DENIES** Superior's MJAR, and **GRANTS** the government's MJAR.

Pursuant to RCFC 52.1, and the Federal Circuit's decisions in *CACI* and *American Relocation*, the clerk is directed to enter **JUDGMENT** for Defendant, the United States, on the merits. To the extent Superior has failed to demonstrate prejudice (*i.e.*, an Article III injury-in-fact), this judgment also supports dismissal pursuant to RCFC 12(b)(1), consistent with the Supreme Court's decision in *Brownback*, 141 S. Ct. at 750 n.8.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge